PENNSYLVANIA TURNPIKE
COMMISSION, Petitioner

v.

TEAMSTERS LOCAL UNION
NO. 77, Respondent.

Commonwealth Court of Pennsylvania.

Argued Feb. 12, 2014.

Decided March 7, 2014.

---

Kelly S. Sullivan, Media, for Petitioner.

Thomas H. Kohn, Philadelphia, for Respondent.

BEFORE: PELLEGRINI, President Judge, and LEADBETTER, Judge, and COHN JUBELIRER, Judge, and SIMPSON, Judge, and LEAVITT, Judge, and McCULLOUGH, Judge, and COVEY, Judge.

OPINION BY Judge COVEY.

The Pennsylvania Turnpike Commission (Commission) petitions this Court for review of the August 31, 2013 arbitration award (Award) sustaining Teamsters Local Union No. 77's (Union) grievance that the Commission violated the Collective Bargaining Agreement (CBA) by subcontracting grass cutting previously done by Union members. The issues before this Court are: (1) whether the Award is rationally derived from the CBA's plain language, and (2) whether the Award contravenes well-settled public policy. We affirm in part and vacate in part.

The Commission is responsible for operating and maintaining the Pennsylvania Turnpike (Turnpike) and numerous off-Turnpike properties. The Commission employs Union members to maintain the Turnpike pursuant to a CBA effective October 1, 2007 through September 30, 2011.[1] Article 2—Management Rights—of the CBA provides:

> Section 1. Except as expressly limited by relevant statutes and codes or provisions of this agreement and reserving unto the Commission any and all management rights which, by law, may not be bargainable, the Commission shall have and retain, solely and exclusively, all other managerial responsibilities, power and authority, which shall include, but not be limited to: the right to establish policies; to establish, change or abolish job classifications or the job content of any classification; to hire, retire, demote, layoff and recall employees to work; to control and regulate the use of machinery, equipment and other property of the Commission; to introduce new or improved research, development and services; to determine the number and types of employees required and to assign work to such employees in accordance with the operational needs of the

---

1. Article 37—Duration—of the CBA specifies that the CBA will continue "thereafter from year to year" unless either party notifies the other in writing of its desire to modify or terminate it. Reproduced Record at 47a.

Commission; and to direct the work force, except as expressly modified or restricted by a specific provision of this agreement. Absent an emergency or other operational need, the Commission will provide the Union with any new or revised policy 15 days prior to implementing the same.

Section 2. The **listing of specific rights in this agreement is not** intended to be nor shall it be considered restrictive or **a waiver of any of the rights of management not listed and not specifically surrendered herein** whether or not such rights have been exercised by the Commission in the past.

Reproduced Record (R.R.) at 6a (emphasis added). In Article 17—General Provisions, Section 3. Subcontracting—of the CBA, the parties agreed:

The Commission may subcontract new construction; the reconstruction and rehabilitation of roadways, structures and facilities; the installation of new equipment; and all work incidental to the foregoing; and original equipment and facility warranties. The Commission agrees that it will not subcontract other work which, by past practice or tradition, it has not heretofore subcontracted. The Commission may subcontract work that either the employees are incapable of competently performing or which the Commission lacks the necessary manpower and/or equipment with which to perform such work.

R.R. at 36a–37a.

In 2010, the Commission's newly-installed Director of Maintenance, Todd Garrison (Garrison), analyzed the needs and demands of the Turnpike's maintenance departments. Garrison found that the Turnpike, particularly in District 4 (Trevose), was deteriorated due to neglected maintenance. Thereafter, the Commission implemented steps to re-allocate maintenance resources to physical highway maintenance, emphasizing that when prioritizing maintenance department tasks, the primary focus was to be on safety. In 2012, the Commission obtained bids and eventually retained the services of a landscaping firm to mow the Commission's 25 off-Turnpike properties at Trevose. Until that time, Trevose shed equipment operators and summer interns mowed the off-Turnpike properties in that jurisdiction.

On July 31, 2012, Union Steward Robert Miller (Miller) filed a grievance claiming that the Commission violated CBA Article 17, Section 3 by using subcontractors to perform Trevose's grass mowing operations. *See* R.R. at 58a. On August 22, 2012, the Commission, by Trevose Superintendent Charles Jackson (Jackson), admitted that the mowing had been subcontracted, but denied violating the CBA, stating:

The reason behind this action is the amount of work that is needed on the highway. We do not have the man hours available to take care of both the work that needs to be done on the highway and the cutting of off[-T]urnpike properties. The [C]ommission[']s first priority is always roadway maintenance[,] therefore the grass cutting was subcontracted out.

R.R. at 60a.

The Union appealed from the Commission's denial under Step 2 of the grievance procedure. *See* R.R. at 59a. By December 19, 2012 letter, the Commission's Manager of Labor Relations Patrick Caro, likewise, denied the grievance, stating that "due to the changes in traffic volume and the Maintenance Department's strategic planning, the current workload o[f] the employees at Trevose Maintenance does not allow the time nor the manpower to properly maintain 25 off-[Turn]pike prop-

erties. Therefore[,] the decision was made to subcontract the mowing." R.R. at 57a.

■ The Union invoked the CBA's arbitration provision. *See* R.R. at 56a. A hearing was held before Arbitrator Ralph Colflesh, Jr. (Arbitrator) on July 30, 2013. In his August 31, 2013 Award, the Arbitrator sustained the Union's grievance, ordered the Commission to cease and desist subcontracting and to pay the Union for the hours of work performed by the subcontractor at the prevailing average straight time hourly wage in effect for the bargaining unit members who would have done the job. *See* Commission Br. Ex A. The Commission appealed to this Court.[2]

■ The Commission first argues that the Award does not survive the essence test because it altered the fundamental bargained-for essential terms and conditions in the CBA, and vitiated the management rights and subcontracting provisions of the CBA.

> Under the essence test, an arbitration award will be upheld if: (1) the issue, as properly defined, is within the collective bargaining agreement; and (2) the arbitrator's award can be rationally derived from the collective bargaining agreement. We may only vacate an arbitrator's award under the essence test 'where the award indisputably and genuinely is without foundation in, or fails to logically flow from, the collective bargaining agreement.'

*Slippery Rock Univ. of Pennsylvania, Pennsylvania State Sys. of Higher Educ. v. Ass'n of Pennsylvania State Coll. & Univ. Faculty,* 71 A.3d 353, 358 (Pa. Cmwlth.2013) (quoting *State Sys. of Higher Educ. (Cheyney Univ.) v. State College Univ. Prof'l Ass'n (PSEA–NEA),* 560 Pa. 135, 150, 743 A.2d 405, 413 (1999)) (citation omitted).

Because there was no transcript of the arbitration proceedings, the facts herein are taken solely from the Award. *See United Sch. Dist. v. United Educ. Ass'n,* 782 A.2d 40 (Pa.Cmwlth.2001). The Arbitrator summarized the facts as follows:

> Factual Contentions of the Union:
>
> Robert Miller, an equipment operator in the bargaining unit and a 19–year employee testified that he saw a subcontractor cutting grass near the Commission's bridge over the Delaware River in the summer of 2012. He further testified that the work had been done by the bargaining unit at that location every year until 2012. He also introduced a list of properties where grass cutting and trimming had been historically done by the bargaining unit out of the Trevose facility. ( [R.R. at 61a] ). Mr. Miller further stated that the work had been done during the bargaining unit members regular work day and not on overtime. Equipment necessary for the work is still at the Trevose location, he explained.
>
> Under cross-examination, Mr. Miller conceded that only 3 of his 19 years with

**2.** [O]ur review of this appeal from a [Public Employe Relations Act] arbitration award is governed by the essence test. If the issue falls within the scope of the parties' CBA, we may vacate the arbitration award only if it indisputably and genuinely is without foundation in, or fails to logically flow from, the CBA. Under *[Westmoreland Intermediate Unit # 7 v. Westmoreland Intermediate Unit # 7 Classroom Assistants Educ.*

*Support Pers. Ass'n, PSEA/NEA,* 595 Pa. 648, 939 A.2d 855 (2007) *(Westmoreland)* ], if the essence test is satisfied, we may consider further whether the award violates a well-defined and dominant public policy. *Phila. Hous. Auth. v. Am. Fed'n of State, Cnty. & Mun. Emps., Dist. Council 33, Local 934,* 617 Pa. 69, 76–77, 52 A.3d 1117, 1121 (2012) (citation and quotation marks omitted).

the Commission were at the Trevose site and that in past years the Commission had hired 2 or 3 summer workers as seasonal employees but that in 2012, it had hired only one. He also maintained that bargaining unit workers have installed signage and that he does not have personal knowledge of subcontracting at other than the Trevose location.

Paul Morrison, the Business Agent for the Union confirmed that bargaining unit help has done grass cutting on Commission property in the past. Like Mr. Miller, Mr. Morrison said he was unaware of whether contractors were cutting grass on other Commission property previously serviced out of the Trevose location.

Factual Contentions of the Commission: The Commission presented testimony from Todd Garrison, the Director of Maintenance for the Turnpike. He said he had done an analysis of Maintenance functions in 2010 and found a great backlog of work that needed to be performed. In order to address that need, he testified, he decided to reallocate maintenance workers to what he considered the critical aspects of their work: maintaining the roadway. In addition, he said, the Commission has a pressing need for maintenance on its bridges and has recently been mandated to improve its signage to direct traffic where there is a change in flow, including around construction or repair sites. At the same time, he said, the Commission has been unable to hire the same compliment [sic] of summer help as it had in the past.

For those reasons, he said, the Commission decided to hire contractors to do grass cutting at locations not on or immediately adjacent to the roadway. Mr. Garrison said the Commission had also subcontracted grass cutting at a location in Downingtown and on two properties off the Northeast Extension, none of which sites would be serviced by bargaining unit personnel out of Trevose. Subcontracting at the Northeast Extension sites has occurred, he said, 'for some time.'

Charlie Jackson, the Superintendent of District 4, which is served by the Trevose facility, testified that some of the properties where grass cutting has been subcontracted are well off the right-of-way and require travel commitments of up to 30 minutes round-trip.

Commission Br. Ex. A at 3–4.

Based upon these facts, the Arbitrator held, in relevant part:

Management rights provisions typically reserve to employers essential, residual rights that naturally adhere in the employer and that can only be modified by some specifically bargained provision in the labor contract. So it is in this case, in which the Commonwealth has retained certain rights, including the right to assign work and manage its workforce, but with the proviso that the Commonwealth cannot exercise unilateral jurisdiction over matters that are specifically bargained in the Agreement.

One such matter is the subject of subcontracting. A review of Article 17, Section 3, reveals that the Union and Commonwealth agreed the Commission could subcontract work that it had subcontracted in the past, work beyond the scope of the work force and its equipment, and work involving reconstruction and rehabilitation, installation of original equipment, and facility warranties. [R.R. at 26a–37a]. That list is exhaustive and does not include grass cutting. Moreover, it is clear that the bargaining unit had the manpower, competency, and necessary equipment to do the work.

The result is that the work could not be subcontracted without violating the Agreement. To the extent it was in the summer of 2012 and forward, the subcontracting breeched [sic] the Agreement.

Commission Br. Ex. A at 6.

Article 26.A.1—Third Step: Arbitration—of the CBA states, in pertinent part:

The Arbitrator shall have no power or authority to add to, subtract from or modify the provision of this agreement in arriving at a decision of the issue(s) presented and shall confine his decision solely to the application and interpretation of this agreement. The decision or award of the arbitrator shall be final and binding. . . .

R.R. at 43a. Section 702 of the Public Employe Relations Act (PERA)[3] provides:

Public employers shall not be required to bargain over matters of inherent managerial policy, which shall include but shall not be limited to such areas of discretion or policy as the functions and programs of the public employer, standards of services, its overall budget, utilization of technology, the organizational structure and selection and direction of personnel. Public employers, however, shall be required to meet and discuss on policy matters affecting wages, hours and terms and conditions of employment as well as the impact thereon upon request by public employe representatives.

43 P.S. § 1101.702. Pursuant to Article 2, Section 2, of the CBA and Pennsylvania law, the Commission retained all management rights unless it agreed otherwise. This Court has held that "[e]ven though a public employer is not statutorily required to negotiate regarding matters of inherent managerial rights, if it chooses to do so, absent contrary positive legislation, it is bound by the terms of a collective bargaining agreement." *Coatesville Area Sch. Dist. v. Coatesville Area Teachers' Ass'n/Pennsylvania State Educ. Ass'n*, 978 A.2d 413, 417 (Pa.Cmwlth.2009); *see also Scranton Sch. Bd. v. Scranton Fed'n of Teachers, Local 1147, A.F.T.*, 27 Pa. Cmwlth. 152, 365 A.2d 1339 (1976). Article 36, Section 1 of the CBA—Waiver—states: "Both parties acknowledge that **this agreement represents the results of negotiations between said parties** conducted under and in accordance with [PERA] and constitutes the entire agreement between the parties for the life of this agreement. . . ." R.R. at 47a (emphasis added). Thus, even if subcontracting was a management right, the Commission agreed to limitations on that right except when, *inter alia*, it lacks the necessary manpower.

Article 2, Section 1 of the CBA reserves to the Commission "the right . . . to direct the work force, except as expressly modified or restricted by a specific provision of this agreement." R.R. at 6a. Article 17, Section 3, specifically authorizes the Commission to subcontract certain work not at issue here, work it has previously subcontracted and work which is either beyond the employees' capabilities, or for which the Commission "**lacks the necessary manpower**" or equipment. R.R. at 36a–37a (emphasis added).

■ The Arbitrator determined that "it is clear that the bargaining unit had the manpower, competency, and necessary equipment to do the work." Commission Br. Ex. A at 6. The well-established law provides that "[a]n arbitrator's findings of fact are not reviewable by an appellate court, and as long as he has arguably construed or applied the collective bargaining agreement, an appellate court may not

---

**3.** Act of July 23, 1970, P.L. 563, *as amended,* 43 P.S. §§ 1101.101–1101.2301.

second-guess his findings of fact or interpretation." *Am. Fed'n of State, Cnty. & Mun. Emps., Dist. Council 47 v. City of Phila.,* 53 A.3d 93, 97 (Pa.Cmwlth.2012) (quotation marks omitted). Here, because the Award is not "indisputably and generally [ ] without foundation in" the CBA, and it appears to "logically flow from" the CBA, it survives the essence test, and this Court may not vacate it. *Slippery Rock Univ.,* 71 A.3d at 358 (quoting *Cheyney Univ.,* 560 Pa. at 150, 743 A.2d at 413).

■ The Commission next argues that the Award contravened well-settled public policy since, under PERA, the General Assembly recognized a paramount right of Commonwealth citizens to keep inviolate the guarantees of their health, safety and welfare. The Commission also contends that the Award prohibits the Commission from assigning and directing its workforce to undertake its essential government function of constructing, operating and maintaining the Turnpike. Finally, the Commission avers that the Award impermissibly assessed punitive damages against the Commission.

■ Having determined that the Award satisfied the requirement that it draw its essence from the CBA, the remaining issue is whether the Award violated public policy. *Phila. Hous. Auth.* As "a pure question of law; our standard of review is *de novo,* and our scope of review is plenary." *Id.* at 77, 52 A.3d at 1121. The public policy exception to the essence test is narrow.[4] *Bethel Park Sch. Dist. v. Bethel Park Fed'n of Teachers, Local 1607, Am. Fed'n of Teachers, AFL–CIO,* 55 A.3d 154 (Pa.Cmwlth.2012).

[T]his Court [has] applied the public policy exception to the essence test, explaining that an arbitration award will not be upheld if it contravenes public policy. We noted that public employees, as well as their employers, owe their duty of fidelity to the citizens and must act with concern for the citizens' welfare. In ascertaining whether a violation of public policy has occurred, we look to the policy implications of the arbitration award. In *City of Bradford [v. Teamsters Local Union No. 110,* 25 A.3d 408 (Pa.Cmwlth.2011) ], we held that application of the public policy exception requires a three-step analysis:

> First, the nature of the conduct leading to the discipline must be identified. Second, we must determine if that conduct implicates a public policy which is well-defined, dominant, and ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests. Third, we must determine if the arbitrator's award poses an unacceptable risk that it will undermine the implicated policy and cause the public employer to breach its lawful obligations or public duty, given the particular circumstances at hand and the factual findings of the arbitrator.

*Slippery Rock Univ.,* 71 A.3d at 364 (citations omitted) (quoting *City of Bradford,* 25 A.3d at 414).

The cease and desist portion of the Award prohibited the Commission from subcontracting its off-Turnpike mowing jobs under the current circumstances.

4. [I]n *Westmoreland,* a majority of [the Supreme] Court adopted a public policy exception to the essence test, although Mr. Justice Saylor, whose vote was necessary to recognizing that approach, emphasized that his concurrence was based on 'the understanding that the exception is exceptionally narrow, consistent with this Court's prior explanations.' *[Id.* at 669,] 939 A.2d at 868 (Saylor, J., concurring).
*Phila. Hous. Auth.,* 617 Pa. at 83, 52 A.3d at 1125.

The Commission argues that the Award violated the fundamental public policy embodied by PERA. Section 101 of PERA provides:

> The General Assembly of the Commonwealth of Pennsylvania declares that it is the public policy of this Commonwealth and the purpose of this act to promote orderly and constructive relationships between all public employers and their employes subject, however, to the paramount right of the citizens of this Commonwealth to keep inviolate the guarantees for their health, safety and welfare. Unresolved disputes between the public employer and its employes are injurious to the public and the General Assembly is therefore aware that adequate means must be established for minimizing them and providing for their resolution. Within the limitations imposed upon the governmental processes by these rights of the public at large and recognizing that harmonious relationships are required between the public employer and its employes, the General Assembly has determined that the overall policy may best be accomplished by (1) granting to public employes the right to organize and choose freely their representatives; (2) requiring public employers to negotiate and bargain with employe organizations representing public employes and to enter into written agreements evidencing the result of such bargaining; and (3) establishing procedures to provide for the protection of the rights of the public employe, the public employer and the public at large.

43 P.S. § 1101.101. There is no question that Section 101 of PERA recognizes the importance of protecting the public from the harm that can result when public employers and their employees cannot quickly resolve their labor disputes. It is also undisputed that in Section 8106 of the Turnpike Organization, Extension and Toll Road Conversion Act,[5] the General Assembly has designated the construction, operation and maintenance of the Turnpike "an essential governmental function of the Commonwealth." 74 Pa.C.S. § 8106.

The Award required the Commission to use the Union workforce, rather than subcontractors, to mow grass at the Commission's off-Turnpike properties. Based upon the Arbitrator's determination, taken from the Union's representations, the Union can still mow the grass despite its other Turnpike work. While the needs of the travelling public's safety on the Turnpike is obvious, the need to have the grass mowed at off-Turnpike properties is not. Given the Arbitrator's findings, and without evidence that the Commission's failure to mow the grass at off-Turnpike properties on a regular basis will harm the public's health, safety and welfare, the Award's cease and desist order does not clearly pose an unacceptable risk that it will undermine any implicated policy or cause the Commission to breach its lawful obligations or public duty. *Slippery Rock Univ.* Therefore, this Court affirms the cease and desist portion of the Award.

■ In regard to the monetary portion of the Award, the Arbitrator stated:

> As Arbitrator Stephen M. Schwerin, Esq. held in July 2010 [in *Pennsylvania Turnpike Commission and Teamsters Local 250* (*Local 250*) Opinion and Award, R.R. at 63a–76a[6]] when faced

---

**5.** By Section 3 of the Act of July 18, 2007, P.L. 169, Chapter 81 was added as a continuation of the Act of September 30, 1985, P.L. 240, known as the Turnpike Organization, Extension and Toll Road Conversion Act, 36 P.S. §§ 651.1 to 651.20 and 652.

**6.** The CBA applies to Teamsters Local Union Nos. 77 (East) and 250 (West). Thus, the

with similar facts, the remedy for such a breach is a cease and desist order and payment to the Union for the hours of work performed by the subcontractor at the prevailing average straight time hourly wage in effect for the bargaining unit members who would have done the job. As my colleague did three years ago, I will enter such an Award.

Commission Br. Ex. A at 6–7. Here, as in *Local 250*, the monetary award was issued despite the Commission's undisputed contention that no Union members lost any wages. In *Local 250*, the arbitrator explained: "I acknowledge the Commission's position, but I recognize the importance of subcontracting language to the [U]nion. Specific requirements were negotiated to insure subcontracting would only occur provided all elements were met. The Commission made no attempt to address the requirements." [7] R.R. at 75a.

On the issue of punitive damages imposed upon a Commonwealth agency, this Court has explained:

Citing federal cases, in *City of Philadelphia Office of Housing and Community Development v. American Federation of State, County and Municipal Employees, Local Union No. 1971*, 583 Pa. 121, 876 A.2d 375 [(2005)], our Supreme Court held that under the essence test, an arbitrator could not award punitive damages because government agencies have long been exempt from the imposition of punitive damages. In that case, the City of Philadelphia Office of Housing and Community Development (OHCD) only had two employees capable of performing that type of work required, home inspections, among its 33 employees. Instead of using union workers to perform the required inspections, the OHCD bid out the work to non-union firms. The union filed a grievance for violating the collective bargaining agreement, and an arbitrator found a violation of that agreement. The arbitrator awarded monetary damages equal to the wages the union workers would have been paid for performing the inspections to be paid to the union to repair its 'vitality' of the union; the union calculated the sum at 'roughly $900,000.' *Id.*, 583 Pa. at 126, 876 A.2d at 377. A petition to vacate was filed with the trial court, which was denied, and an appeal was taken to this Court. We reversed because the damages awarded were punitive, and the remedy did not draw its essence from the collective bargaining agreement. Our Supreme Court granted allocatur to determine whether the damages awarded by the arbitrator were punitive and unlawful.

In holding that the award of damages was punitive, the Court first stated that it had defined punitive damages as "compensation awarded to punish a party for actions 'of such an outrageous nature as to demonstrate intentional, willful, wanton or reckless conduct,'" *Id.*, 583 Pa. at 124, 876 A.2d at 376–377, and that it had not found punitive damages to be a proper award by an arbitrator for the breach of a collective bargaining agreement. The Court explained that under this set of facts, the award was not to make the members whole for lost wages, but to punish the behavior of the governmental employer. Because who was being punished was unknowing taxpayers, the Court stated, '[I]t is against the public policy of our Commonwealth to award punitive damages against a Commonwealth agency. Noting that government agencies have long been exempt from the imposition

---

CBA at issue in *Local 250* is the same CBA in question in this case.

7. Neither party states whether the *Local 250* monetary award was appealed.

of punitive damages, ... our Court echoed the concerns of the United States Supreme Court that punitive damages imposed on a municipality were, in effect, a windfall to a fully compensated plaintiff and are likely accompanied by an increase in taxes or a reduction of public services.' *Id.,* 583 Pa. at 126, 876 A.2d at 378. *Phila. Hous. Auth. v. Am. Fed'n of State, Cnty. & Mun. Emps., Dist. Council 47, Local 2187, AFL–CIO,* 945 A.2d 796, 800–01 (Pa.Cmwlth.2008).

The Arbitrator here stated that he was entering the same Award as his colleague did in *Local 250* based upon "similar facts." Commission Br. Ex. A at 6. Unlike the instant case, in *Local 250,* the arbitrator stated that "[t]he Commission makes no attempt to address the [subcontracting] requirements." R.R. at 75a. No such finding or conclusion was made in the instant case. Here, the Arbitrator did not award damages because there were none. Rather, he directed payment to the Union and imposed a penalty based on allegedly "similar facts" but in actuality different findings. Because "under this set of facts, the [A]ward was not to make the members whole for lost wages, but to punish the [Commission's] behavior," this Court holds that the monetary portion of the Award impermissibly assessed punitive damages against the Commission with the effect of punishing taxpayers. Accordingly, that portion of the Award is vacated. *Phila. Hous. Auth.,* 945 A.2d at 801.

Based upon the foregoing, the Award is affirmed in part and vacated in part.

### ORDER

AND NOW, this 7th day of March, 2014, the cease and desist portion of the August 31, 2013 arbitration award (Award) sustaining Teamsters Local Union No. 77's grievance is affirmed. The monetary portion of the Award is vacated.

**A.S., Petitioner**