# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Pennsylvania Turnpike Commission, :
                    Petitioner :
                         :
        v. : No. 89 C.D. 2015
                         : Argued: June 18, 2015
Teamsters Local Union No. 250, :
               Respondent :


BEFORE:  HONORABLE DAN PELLEGRINI, President Judge
             HONORABLE BERNARD L. McGINLEY, Judge (P.)
             HONORABLE P. KEVIN BROBSON, Judge


*OPINION NOT REPORTED*

**MEMORANDUM OPINION**
**BY JUDGE BROBSON**                 **FILED:  July 8, 2015**


The Pennsylvania Turnpike Commission (Commission) petitions for review of the December 22, 2014, arbitration award (Award) sustaining Teamsters Local Union No. 250's (Local 250) grievance that the Commission violated their Collective Bargaining Agreement (CBA) by subcontracting grass mowing work previously performed by Local 250 members.  We now affirm.

The Commission, Local 250, and Teamsters Local Union No. 77 (Local 77) are parties to a CBA.[1]  The Commission is responsible for the operation and maintenance of the Pennsylvania Turnpike (Turnpike).  Local 250 represents Turnpike toll collectors and maintenance employees who work on the western half

---

[1] The CBA was effective October 1, 2007, through September 30, 2011.  Although the CBA has expired, the parties are still operating under its terms and conditions while they negotiate a new collective bargaining agreement.

of the Turnpike, and Local 77 represents those who work on the eastern half of the Turnpike.

Local 250 and Local 77 filed grievances alleging that the Commission violated the terms of the CBA by subcontracting mowing work that was previously completed by maintenance employees of Local 250 and Local 77. The Commission denied the grievance, claiming that under the CBA, the Commission had the right to subcontract mowing work on "the property that the [T]urnpike purchases off the system." (Reproduced Record (R.R.) at 57a.) The parties later agreed to hold Local 250's grievance in abeyance pending the outcome of Local 77's grievance. (*Id.* at 58a.) An arbitrator sustained Local 77's grievance and ordered the Commission to cease and desist the subcontracting of mowing work and to "make payment to . . . [Local 77] for the hours of work performed by the subcontractor at the prevailing average straight time hourly wage in effect for bargaining unit members who would have done the job." (*Id.* at 81a.) On appeal, this Court vacated the monetary portion of the arbitrator's award, concluding that it constituted an impermissible punitive damages award.[2]

After the resolution of Local 77's grievance, Local 250 proceeded with its grievance. Arbitrator Atul S. Maharaja, Esq. (Arbitrator), conducted a hearing and issued an opinion sustaining Local 250's grievance. The Arbitrator considered the following relevant provisions of the CBA, relating to management rights, overtime, and subcontracting:

---

[2] *See Pa. Tpk. Comm'n v. Teamsters Local Union No. 77*, 87 A.3d 904 (Pa. Cmwlth. 2014).

2

## ARTICLE 2: MANAGEMENT RIGHTS

**Section 1.** Except as expressly limited by relevant statutes and codes or provisions of this agreement and reserving unto the Commission any and all management rights which, by law, may not be bargainable, the Commission shall have and retain, solely and exclusively, all other managerial responsibilities, power and authority, which shall include, but not be limited to: the right to establish policies; to establish, change or abolish job classifications or the job content of any classification; to hire, retire, demote, layoff and recall employees to work; to control and regulate the use of machinery, equipment and other property of the Commission; to introduce new or improved research, development and services; to determine the number and types of employees required and to assign work to such employees in accordance with operational needs of the Commission; and to direct the work force, except as expressly modified or restricted by a specific provision of this agreement. Absent an emergency or other operational need, the Commission will provide . . . [Local 250] with any new or revised policy 15 days prior to implementing the same.

**Section 2.** The listing of specific rights in this agreement is not intended to be nor shall it be considered restrictive or a waiver of any of the rights of management not listed and not specifically surrendered herein whether or not such rights have been exercised by the Commission in the past.

. . .

## ARTICLE 9: OVERTIME

**Section 1.** All employees covered herein shall receive one and one-half (1-1/2) times their regular hourly rate of pay for all hours worked in excess of eight (8) or ten (10) hours in any work day as defined in Article 8 hereof or forty (40) hours in any pre-established work week except in case of a tour swap or any other exception specified elsewhere in this agreement. There shall be no duplication or pyramiding of any premium pay provided for under the provisions of this agreement for the same hours worked.

**Section 2.**

. . .

      B.     Maintenance and Construction

When the need for overtime arises in Maintenance and Construction, the Commission shall assign overtime from a list of qualified employees within the job classifications who normally perform such work at the location on the basis of their status on the overtime seniority list. Assignments from said list shall be rotated in descending order of seniority: The objective is to provide a reasonable procedure for affording employees overtime work opportunities as the need arises. Once an employee is offered overtime, he shall not be offered another overtime assignment until all employees on said list below him in seniority have been afforded the opportunity to work overtime. Any employee on said list who is not available at the time the overtime work arises or who declines an offer of overtime work shall be credited for the assignment solely for purposes of the rotation. The supervisor, or his designee, shall be responsible for maintaining said overtime list and shall indicate the employees eligible for any overtime assignments. All calls for overtime shall be verified by the job steward or another employee, if readily available. . . . In the Maintenance Department, an overtime opportunity will not be charged until four (4) hours of overtime have been accumulated. During winter shifting, employees shall be credited for an overtime opportunity for each eight (8) hours worked.

. . .

**Section 11.**

. . .

      A.     Consistent with Article 9, in the event that overtime opportunities are refused by all employees, the overtime shift shall be assigned to the employee currently working with the least amount of seniority. This will be known as a "forced overtime assignment[."]

B.    When an additional "forced overtime assignment" is required during the twenty-eight (28) day work schedule, the next least senior employee currently working shall be required to work the overtime shift.

C.    All future "forced overtime assignments" arising during a twenty-eight (28) day work schedule shall be made in inverse order of seniority.

. . .

### ARTICLE 17: GENERAL PROVISIONS

. . .

### Section 3.   SUBCONTRACTING

The Commission may subcontract new construction; the reconstruction and rehabilitation of roadways, structures and facilities; the installation of new equipment; and all work incidental to the foregoing; and original equipment and facility warranties. *The Commission agrees that it will not subcontract other work which, by past practice or tradition, it has not heretofore subcontracted. The Commission may subcontract work that either the employees are incapable of competently performing or which the Commission lacks the necessary manpower and/or equipment with which to perform such work.*

(*Id.* at 6a, 16a-19a, 36a-37a (emphasis added).)  After considering the provisions of the CBA, the Arbitrator determined:

In the present hearing it was clearly established that in the past mowing was, when necessary, done on regular and/or overtime basis.  The [CBA] has clearly spelled out not only the management's right to demand overtime but also the concept of "forced overtime[.]"  Since the parties have negotiated the management's right to demand overtime it is an implied promise to utilize overtime rather than out side [sic] contractors.  Mr. Garrison's[3]

---

[3] Todd Garrison, Director of Maintenance for the Commission, testified before the Arbitrator.  The Arbitrator explained that Mr. Garrison believed that Local 250 did not have the manpower to maintain the grass at the Commission's offsite properties.  (Award at 38.)  Mr. **(Footnote continued on next page…)**

testimony is very clear he would rather use subcontractors than bargaining unit employees. The Commission has the responsibility and authority to direct the working forces. If an insufficient number of employees volunteer to perform particular work, the Commission's responsibility includes directing them to perform it. Directing the requisite number of employees to perform the work would have relieved the Commission of contracting out the work. Mr. Garrison was very clear that he was not going to use overtime for mowing even though he admits that not utilizing overtime is a lost opportunity for work.

. . .

Based on the . . . facts it is very clear that there was no lack of manpower to carryout [sic] the [b]argaining [u]nit work, if employees would have been scheduled and/or directed to perform the work as per the CBA.

(Award at 40.) In sustaining Local 250's grievance, the Arbitrator ordered the Commission to cease and desist subcontracting the mowing work and to determine, in conjunction with Local 250, "the number of hours performed by the subcontractor and compensate [Local 250] employees who would have performed said work. The rate shall be at the straight time hourly rate." (*Id.* at 41.) The Commission appealed to this Court.

On appeal,[4] the Commission first argues that the Award does not satisfy the essence test because it is not rationally derived from the CBA. Next, the

_____

**(continued…)**

Garrison could only testify to the performance of mowing work during his three years of employment with the Commission. (*Id.*) Three Local 250 witnesses testified that the mowing work was never done by subcontractors but by Local 250 members on an overtime basis. (*Id.* at 36-37.)

[4] The proper standard of review for an appeal of an arbitration award arising under the Public Employe Relations Act (PERA), Act of July 23, 1970, P.L. 563, *as amended*, 43 P.S. **(Footnote continued on next page…)**

6

Commission contends that the Award contravenes well-settled public policy concerning the assessment of punitive damages against a Commonwealth agency. Finally, the Commission argues that the Award contravenes the public policy of the Public Employe Relations Act (PERA), Act of July 23, 1970, P.L. 563, *as amended*, 43 P.S. §§ 1101.101-.2301. We first address the Commission's argument that the Award is not rationally derived from the CBA, and, thus, the Award fails to satisfy the essence test. Specifically, the Commission contends that the Award "altered essential terms and conditions of the [CBA]" and "vitiate[d] entirely the management and subcontracting rights sections of the [CBA] as the . . . Commission has been stripped of its ability to direct and assign its workforce." (Pet'r's Br. at 13.)

The "essence test is the standard of review by which courts will review grievance arbitration awards arising under PERA." *Westmoreland Intermediate Unit # 7 v. Westmoreland Intermediate Unit # 7 Classroom Assistants Educ. Support Pers. Ass'n*, 939 A.2d 855, 863 (Pa. 2007) (*Westmoreland I.U. # 7*). An arbitrator's award satisfies the test if it "draw[s] its essence from the collective bargaining agreement." *State Sys. of Higher Educ. (Cheyney Univ.) v. State Coll. Univ. Prof'l Ass'n (PSEA-NEA)*, 743 A.2d 405, 413 (Pa. 1999). A court reviewing an arbitrator's award under the essence test must conduct a two-prong analysis:

> First, the court shall determine if the issue as properly defined is within the terms of the collective bargaining

---

**(continued…)**

§§ 1101.101-.2301, is the essence test. *Westmoreland Intermediate Unit # 7 v. Westmoreland Intermediate Unit # 7 Classroom Assistants Educ. Support Pers. Ass'n*, 939 A.2d 855, 863 (Pa. 2007) (*Westmoreland I.U. # 7*).

7

> agreement. Second, if the issue is embraced by the agreement, and thus, appropriately before the arbitrator, the arbitrator's award will be upheld if the arbitrator's interpretation can rationally be derived from the collective bargaining agreement. That is to say, a court will only vacate an arbitrator's award where the award indisputably and genuinely is without foundation in, or fails to logically flow from, the collective bargaining agreement.

*Id.*

The Award is rationally derived from the CBA. The Arbitrator, reading together Articles 2, 9, and 17 of the CBA, interpreted the CBA as requiring the Commission to direct employees to perform overtime work in the event that such work is necessary. The Arbitrator also interpreted the CBA as providing that employees are entitled to available overtime work if that work was traditionally performed by Local 250. The Arbitrator found that Local 250 had, in the past, performed the required mowing work on off-Turnpike properties. The Commission must, therefore, assign overtime mowing work to its employees rather than subcontractors. The cease and desist order logically flows from the CBA as it requires the Commission to assign the overtime mowing work to its employees. The monetary portion of the CBA also logically flows from the CBA, because it reimburses employees for the overtime wages to which they were entitled but did not receive due to the Commission's assignment of mowing work to subcontractors. Accordingly, we reject the Commission's argument that the Award is not rationally derived from the CBA.

The Commission next argues that the Award contravenes well-settled public policy concerning the assessment of punitive damages against a Commonwealth agency. In *Westmoreland I.U. # 7*, our Supreme Court adopted a public policy exception to the essence test. "This exception is grounded in the

8

general rule that a court will not enforce a contract which is unlawful or in violation of public policy." *Westmoreland I.U. # 7*, 939 A.2d at 863. To establish a violation of public policy, "the public policy must be well defined and dominant and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." *Id*. (internal quotation marks omitted). The party asserting the public policy exception has the burden to establish a violation of public policy. *Id.* at 864. The Commission contends that the Award provides a windfall to Local 250 members who did not lose wages as a result of subcontracting and, thus, violates the public policy against assessing punitive damages against Commonwealth agencies.

In support of this contention, the Commission relies on our Supreme Court's decision in *City of Philadelphia Office of Housing and Community Development v. American Federation of State County and Municipal Employees, Local Union No. 1971*, 876 A.2d 375 (Pa. 2005) (*City of Philadelphia OHCD*). In *City of Philadelphia OHCD*, the parties, the City of Philadelphia Office of Housing and Community Development (OHCD) and the American Federation of State, County and Municipal Employees, Local Union No. 1971 (AFSCME), were parties to a collective bargaining agreement which provided that AFSCME members would exclusively perform home inspections for OHCD. Instead of assigning the work to AFSCME members, OHCD subcontracted the home inspections to non-union workers. An arbitrator found that the contracts with non-union workers violated the collective bargaining agreement and assessed damages against OHCD which were based on "wages paid to the hypothesized [AFSCME] workers to repair the 'vitality' of [AFSCME]." *City of Philadelphia OHCD*, 876 A.2d at 377 (emphasis added). Although the arbitrator found that no

9

AFSCME members were injured, AFSCME members were awarded an amount equal to what they would have received had they performed the inspections. *Id.* at 376. OHCD filed a petition to vacate the award, which the Court of Common Pleas of Philadelphia County denied. *Id.* OHCD then appealed to this Court. We concluded that the award did not satisfy the essence test, and we reversed the award. *Id.* AFSCME appealed to the Supreme Court of Pennsylvania, which granted review of the matter. The Supreme Court, in affirming our decision, noted that AFSCME "would never have received those wages; *members* might have received those wages, but . . . [AFSCME] itself would have received only additional dues from prospective new . . . members." *Id.* at 377 (emphasis in original). "Accordingly, the award fashioned by the arbitrator would give . . . [AFSCME] a windfall of almost $30,000 per current member. This did not make [AFSCME] whole, but impermissibly punished OHCD." *Id.* The Supreme Court held that "[t]he arbitrator's award of punitive damages against OHCD, a Commonwealth entity, cannot stand because it exacts retribution on the shoulders of blameless or unknowing taxpayers who would bear the brunt of the award." *Id.*

This Court has addressed the issue in *Pennsylvania Turnpike Commission v. Teamsters Local Union No. 77*, 87 A.3d 904 (Pa. Cmwlth. 2014) (en banc). There, the Commission subcontracted off-Turnpike mowing work and Local 77 alleged that the Commission violated the subcontracting terms of their collective bargaining agreement. The arbitrator entered the following award:

> As Arbitrator Stephen M. Schwerin, Esq.[,] held in July 2010 [in *Pennsylvania Turnpike Commission and Teamsters Local 250 (Local 250)* . . . ] when faced with similar facts, the remedy for such a breach is a cease and desist order and payment to the [u]nion for the hours of work performed by the subcontractor at the prevailing average straight time hourly wage in effect for the

10

bargaining unit members who would have done the job. As my colleague did three years ago, I will enter such an [a]ward.

*Local 77*, 87 A.3d at 912-13. This Court vacated the monetary portion of the arbitrator's award. In so doing, this Court held:

> The Arbitrator here stated that he was entering the same Award as his colleague did in *Local 250* based upon "similar facts." . . . Unlike the instant case, in *Local 250,* the arbitrator stated that "[t]he Commission makes no attempt to address the [subcontracting] requirements." . . . No such finding or conclusion was made in the instant case. *Here, the Arbitrator did not award damages because there were none.* Rather, he directed payment to . . . [Local 77] and imposed a penalty based on allegedly "similar facts" but in actuality different findings. Because "under this set of facts, the [A]ward was not to make the members whole for lost wages, but to punish the [Commission's] behavior," this Court holds that the monetary portion of the Award impermissibly assessed punitive damages against the Commission with the effect of punishing taxpayers.[5] Accordingly, that portion of the Award is vacated. *Phila. Hous. Auth.* [*v. Am. Fed'n of State, Cnty. & Mun. Emps., Dist. Council 47, Local 2187, AFL-CIO*], 945 A.2d [796,] . . . 801 [(Pa. Cmwlth.), *appeal denied*, 960 A.2d 842 (Pa. 2008)].

*Local 77*, 87 A.3d at 914 (alterations in original) (emphasis added).

Here, the Commission contends that it is undisputed that Local 250 members did not lose either hours or wages and, therefore, the damages awarded were punitive and impermissible. Local 250, however, argued before the Arbitrator that "but for the improper subcontracting of the work, the employees would have received additional wages." (Award at 23.) Local 250 continues to

---

[5] Local 250 notes in its brief that the Commission operates on tolls collected, not taxpayer money. (Local 250 Br. at 17-18.)

argue before this Court that its members lost additional work opportunities as a result of the Commission's actions. (Local 250 Br. at 18.) The Arbitrator specifically found "that the bargaining unit employees missed earning opportunities, including overtime." (Award at 41.) "An arbitrator's findings of fact are not reviewable by an appellate court, 'and as long as he has arguably construed or applied the collective bargaining agreement, an appellate court may not second-guess his findings of fact or interpretation.'" *Am. Fed'n of State, Cnty. & Mun. Emps. Dist. Council 47 v. City of Phila.*, 53 A.3d 93, 97 (Pa. Cmwlth. 2012), *appeal denied*, 62 A.3d 380 (Pa. 2013). Thus, unlike *City of Philadelphia OHCD* and *Local 77*, the Arbitrator here found that the Local 250 members incurred monetary damages in the form of lost overtime opportunities. By assessing damages against the Commission, the Arbitrator did not seek to punish the Commission; rather, the Arbitrator intended to compensate Local 250 members for the wages they would have received but for the Commission's decision to subcontract the mowing work. The imposition of damages against the Commission is, therefore, compensatory rather than punitive. The Commission has not established the existence of a public policy against the assessment of compensatory damages against a Commonwealth entity, let alone a violation of such a policy. We, therefore, reject the Commission's argument that the Award violates the public policy against imposing punitive damages on a Commonwealth agency.

Lastly, the Commission argues that the Award contravenes the public policy of PERA. Specifically, the Commission contends that the Award violates Section 101 of PERA, which provides that the purpose of PERA is "to promote orderly and constructive relationships between all public employers and their

12

employes subject, however, to the paramount right of the citizens of this Commonwealth to keep inviolate the guarantees for their health, safety and welfare." 43 P.S. § 1101.101. The Commission also argues that the Award violates Section 8106 of the Turnpike Organization, Extension and Toll Road Conversion Act, 74 Pa. C.S. § 8106, which provides: "The exercise by the commission of the powers conferred by this chapter in the construction, operation and maintenance of the turnpikes and in effecting toll road conversions shall be deemed and held to be an essential governmental function of the Commonwealth."

This Court has previously addressed this issue. In *Local 77*, we concluded:

> The Award required the Commission to use the [Local 77] workforce, rather than subcontractors, to mow grass at the Commission's off-Turnpike properties. Based upon the [a]rbitrator's determination, taken from . . . [Local 77]'s representations, . . . [Local 77] can still mow the grass despite its other Turnpike work. While the needs of the traveling public's safety on the Turnpike is obvious, the need to have the grass mowed at off-Turnpike properties is not. Given the Arbitrator's findings, and without evidence that the Commission's failure to mow the grass at off-Turnpike properties on a regular basis will harm the public's health, safety and welfare, the Award's cease and desist order does not clearly pose an unacceptable risk that it will undermine any implicated policy or cause the Commission to breach its lawful obligations or public duty.

*Local 77*, 87 A.3d at 912 (citations omitted).

The instant matter is analogous, in this respect, to *Local 77*. Here, the Arbitrator specifically found that "there was no lack of manpower to carryout [sic] the . . . work, if employees would have been scheduled and/or directed to perform the work as per the CBA." (Award at 40.) There is, therefore, no reason why

13

Local 250 cannot complete both Turnpike work *and* its mowing work on off-Turnpike properties if the Commission assigns work pursuant to the CBA. Further, the Commission presented no evidence and the Arbitrator made no findings concerning the effect of mowing off-Turnpike properties on the public's health, safety, and welfare. We, therefore, reject the Commission's argument that the Award contravenes the public policy of PERA.

Accordingly, we affirm the Arbitrator's Award.

<br>

_____
P. KEVIN BROBSON, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Pennsylvania Turnpike Commission,    :
                       Petitioner   :
                                  :
              v.                 :   No. 89 C.D. 2015
                                  :
Teamsters Local Union No. 250,    :
                       Respondent  :

## **O R D E R**

AND NOW, this 8th day of July, 2015, the arbitration award sustaining Teamsters Local Union No. 250's grievance is hereby AFFIRMED.

 

 

_____
P. KEVIN BROBSON, Judge