IN THE COMMONWEALTH COURT OF PENNSYLVANIA

County of Allegheny, Pennsylvania    :
    :
v.    :
    :
Allegheny County Prison    :
Employees Independent Union,    :   No. 122 C.D. 2020
    Appellant    :   Argued: October 13, 2020


BEFORE:   HONORABLE ANNE E. COVEY, Judge
            HONORABLE CHRISTINE FIZZANO CANNON, Judge
            HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE FIZZANO CANNON        FILED: November 10, 2020


The Allegheny County Prison Employees Independent Union (Union) appeals the January 23, 2020[1] order of the Court of Common Pleas of Allegheny County (trial court) that granted the County of Allegheny, Pennsylvania's (County) Petition to Vacate, Modify or Correct Arbitrator's Award (Petition to Vacate) regarding an arbitration award entered under the Public Employe Relations Act (PERA), Act of July 23, 1970, P.L. 563, *as amended*, 43 P.S. §§ 1101.101-1101.2301, that sustained a grievance filed by the Union seeking reinstatement of a

---

[1] The trial court originally issued this order on January 10, 2020, but used the wrong docket number. *See* Trial Court Order dated January 10, 2020. Upon learning of the error, the trial court reissued the January 10, 2020 order under the proper docket number on January 23, 2020. *See* Trial Court Order dated January 23, 2020.

terminated corrections officer Union member. Upon review, we reverse the trial court's order and reinstate the arbitrator's award.

The pertinent facts of this matter, while unique, are not meaningfully disputed by either side. Corrections officer Andrew Ruffner began his employment as a corrections officer trainee at the Allegheny County Jail in May 2016. *See* Decision In Termination Case 2017-0557 dated January 10, 2019 (Arbitration Award) at 2. As a corrections officer trainee, Ruffner received training on jail policies and procedures, as well as the responsibilities of a corrections officer. *See* Arbitration Award at 2. As part of the corrections officer trainee program, Ruffner received mandatory training in cardiopulmonary resuscitation (CPR) and First Aid skills. *See id.* Ruffner became a full-time corrections officer in April 2017. *See id.*

As a relatively new employee, Ruffner was a "floater" corrections officer, meaning that he did not have a single, assigned cell block to which he was stationed, but was stationed instead wherever he was needed in the jail. *See* Arbitration Award at 2 & 10. On the morning of September 17, 2017, Ruffner was assigned to Housing Unit 4A, a classification area for incoming prison inmates. *See id.* While conducting a guard tour at approximately 9:48 a.m., Ruffner discovered an inmate who had hung himself inside his cell. *See id.* Ruffner immediately signaled a medical emergency, cut the inmate down using a cut-down tool, and called for medical assistance from the Assistant Director of Nursing (ADON), who was present on the cell block at the time. *See id.* Ruffner waited at the cell door until the ADON arrived at 9:51 a.m. *See id.* Upon arriving, the ADON checked the inmate's vital signs but did not attempt to revive the inmate, instead indicating the inmate was deceased. *See id.* A minute later, at 9:52 a.m., the Allegheny County Jail's Medical Director arrived, administered chest compressions and other

2

emergency medical attention, and revived the inmate, who was then taken to a hospital. *See id.* The inmate died several days later. *See id.*

Based on these facts, the County suspended and ultimately terminated Ruffner on November 17, 2017. *See* Arbitration Award at 2-3 & 10; *see also* Letter of Matthew Kohler dated November 17, 2017 (Termination Letter), Reproduced Record (R.R.) at 313a-14a. As reasons for Ruffner's discharge, the County cited in the Termination Letter a failure to conduct guard tours pursuant to the Housing Unit 4A post orders,[2] violation of Allegheny County Jail Policy 304, Suicide Behavior Detection and Prevention, Section 8,[3] violation of two sections of the County's Code

---

[2] Housing Unit 4A post order No. 7 requires corrections officers to "[c]onduct[] a guard tour every fifteen (15) minutes on an irregular schedule utilizing the key card system and marking it in the log book." Level 4A Post Orders at 2; Reproduced Record (R.R.) at 329a. Housing Unit 4A post order No. 20 further requires that corrections officers "[e]nsure immediate notification is made to medical and supervisory staff and life saving measures are taken to save an inmate in a medical crisis or when causing self-harm." Level 4A Post Orders at 3; R.R. at 330a.

[3] Allegheny County Jail Policy 304, Suicide Behavior Detection and Prevention, Section 8 (concerning suicide security inspections for classification pods), provides that "[l]ife saving measures will be taken by correctional officer if needed." Allegheny County Jail Policy 304, Section 8(F); R.R. at 350a. Allegheny County Jail Policy 304, Section 15 concerns hanging incidents and provides that:

> An employee who discovers an inmate hanging shall:
>
> a) Call for help and for medical assistance. Once help arrives, the employee shall attempt to reduce tension on the inmate's neck by supporting the inmate by the legs while the inmate is facing the employee.
>
> b) Upon arrival of additional staff, the first employee on the scene shall continue to support the inmate['s] body while the second officer shall use the rescue tool (wonder knife) to cut the inmate down. The employee shall immediately remove the noose from around the inmate's neck.
>
> c) Allegheny County Bureau of Corrections' employees are trained in []CPR[] First Aid. As such, correctional employees shall immediately initiate CPR and/or First Aid, as appropriate, until

3

of Ethics for Allegheny County Jail employees,[4] and violation of a directive from the former Deputy Warden regarding how to conduct guard tours. *See* Arbitration Award at 2-3 & 10-11; *see also* Termination Letter at 1, R.R. at 313a. Effectively, the violations listed in the Termination Letter comprised two charges against Ruffner: (1) failure to properly complete and accurately document required guard tours, and (2) failure to provide emergency/lifesaving measures (CPR) to an inmate engaged in self-harm. *See* Arbitration Award at 2-3 & 11; *see also* Termination Letter, R.R. at 313a-14a.

The Union filed a timely grievance that challenged Ruffner's termination as being unsupported by just cause. *See* Official Grievance Form filed September 24, 2017 (Grievance), R.R. at 315a. After the Grievance was denied,[5]

---

medical staff relieves the employee. An employee shall immediately start CPR/First Aid and never wait for medical staff to arrive before starting life saving measures.

d) Upon arrival, the contractor health service providers shall assume medical care and decisions and shall continue CPR and other life saving measures while instructing that 9-1-1 is called.

e) The contractor's Physician, Nurse Practitioner or Physician Assistant or nurse remains the authorized medical authority as it relates to any patient emergency care or decisions until 9-1-1 arrives.

Allegheny County Jail Policy 304, Section 15; R.R. at 354a-55a.

[4] The two sections cited by the County are Code of Ethics Section 2.1, which requires employees to be thoroughly familiar with their duties and responsibilities, and Code of Ethics Section 2.2, which requires that all employees remain constantly attentive and alert in the performance of their duties to promote the safety and welfare of all staff, inmates, visitors, property, and jail interests.

[5] The Grievance underwent multiple levels of review and, following hearings at all levels, was denied at Level 1 on October 3, 2017, at Level 2 on October 16, 2017, and at Level 3 on November 9, 2017. *See* Grievance Hearing Report dated October 3, 2017, R.R. at 316a; Grievance

the Union sought to arbitrate the matter per the collective bargaining agreement in force between the County and the Union (CBA).

An arbitrator conducted a hearing on September 19, 2018, at which both Ruffner and the County were represented by counsel and presented evidence. *See* Arbitration Award at 1. On January 10, 2019, the arbitrator issued the Arbitration Award, which sustained the Grievance in part. *See* Arbitration Award at 15. The arbitrator reviewed the facts of the matter and the testimony presented and, first, determined that Ruffner was not at fault for missing the 9:30 a.m. guard tour.[6] *See id.* Next, regarding Ruffner's failure to immediately commence lifesaving measures, the arbitrator concluded:

> [Ruffner's] misconduct that day was limited to an error in judgment in failing to immediately begin CPR on the inmate that he found hanging in his cell. When this error is considered in conjunction with the misconduct of the ADON, it is concluded that it was not conduct worthy of the severe penalty of discharge. Rather, because [Ruffner's] delay was not willful misconduct or neglect of duty, it is appropriately addressed with a three-day suspension and remedial training[.]

Arbitration Award at 15. Accordingly, the arbitrator sustained the Grievance in part, reduced Ruffner's discharge to a three-day suspension, and ordered Ruffner's immediate reinstatement with back pay and benefits. *See id.*

---

Hearing Report dated October 16, 2017, R.R. at 317a; Letter of Steve Pilarski dated November 9, 2017, R.R. at 318a-19a.

[6] This determination does not form part of the appeal of this matter.

The County filed a Petition to Vacate, which the trial court granted by order dated January 23, 2020[7] (Trial Court Order). *See* Petition to Vacate, R.R. at 372a-94a; *see also* Trial Court Order dated January 23, 2020. The Union appealed the Trial Court Order to this Court.

In its opinion on appeal pursuant to Pennsylvania Rule of Appellate Procedure (Pa.R.A.P.) 1925(a), the trial court explained that the Arbitration Award in this matter satisfied the essence test in that the issue presented – termination for just cause – was within the terms of the CBA and also that the arbitrator's decision logically flowed from the terms of the CBA. *See* Trial Court Pa.R.A.P. 1925(a) Opinion dated March 4, 2020 (Trial Court Opinion) at 11. However, the trial court determined that the Arbitration Award violated a public policy against inmate suicide. *See* Trial Court Opinion at 11. The trial court found the three-day suspension imposed by the arbitrator to be "virtually no penalty" under the circumstances of this case. *Id.* at 14. The trial court concluded, therefore, that the arbitrator's remedy "poses an unacceptable risk of undermining the well-defined public policy against suicide." *Id.* at 14. Accordingly, the trial court vacated the Arbitration Award. *See id.* at 1 & 14.

On appeal, the Union claims that the trial court erred by granting the Petition to Vacate. Specifically, the Union alleges that, given the specific and unique circumstances of this case, the trial court erred in determining that Ruffner's three-day suspension and subsequent reinstatement by the arbitrator violated a well-defined, dominant public policy that seeks to prevent inmate suicide. *See* Union's Brief at 4, 20-39. We agree.

---

[7] *See supra*, n.1.

6

Appellate review of a grievance arbitration award is generally conducted pursuant to the two-part "essence test." *Sch. Dist. of Phila. v. Phila. Fed'n of Teachers*, 164 A.3d 546, 552 (Pa. Cmwlth. 2017). Under the essence test,

> [f]irst, the court shall determine if the issue as properly defined is within the terms of the collective bargaining agreement. Second, if the issue is embraced by the agreement, and thus, appropriately before the arbitrator, the arbitrator's award will be upheld if the arbitrator's interpretation can rationally be derived from the collective bargaining agreement. That is to say, a court will only vacate an arbitrator's award where the award indisputably and genuinely is without foundation in, or fails to logically flow from, the collective bargaining agreement.

*State Sys. of Higher Educ. (Cheyney Univ.) v. State Coll. Univ. Pro. Ass'n (PSEA-NEA)*, 743 A.2d 405, 413 (Pa. 1999); *see also Westmoreland Intermediate Unit # 7 v. Westmoreland Intermediate Unit # 7 Classroom Assistants Educ. Support Pers. Ass'n, PSEA/NEA*, 939 A.2d 855, 863 (Pa. 2007) (*Westmoreland I*). Thus, "[a]n arbitrator's award must be sustained 'if it is based on anything that can be gleaned as the 'essence' of the [collective bargaining agreement].'" *Pa. State Sys. of Higher Educ. v. Ass'n of Pa. State Coll. & Univ. Faculties*, 98 A.3d 5, 14 (Pa. Cmwlth. 2014) (quoting *Am. Fed'n of State, Cnty. & Mun. Emps., Dist. Council 84, AFL–CIO v. City of Beaver Falls*, 459 A.2d 863, 865 (Pa. Cmwlth. 1983)). Further, "[t]he essence test does not permit this Court to vacate an arbitrator's award even if we disagree with the arbitrator's interpretation of the [collective bargaining agreement]." *Am. Fed'n of State, Cnty. & Mun. Emps., Dist. Council 87 v. County of Lackawanna*, 102 A.3d 1285, 1290 (Pa. Cmwlth. 2014) (citing *Cent. Susquehanna Intermediate Unit Educ. Ass'n v. Cent. Susquehanna Intermediate Unit # 16*, 459 A.2d 889, 890 (Pa. Cmwlth. 1983)). "The essence test is an exceptionally deferential

7

standard, because binding arbitration is a highly favored method of dispute resolution." *Dep't of Corr., State Corr. Inst. at Forest v. Pa. State Corr. Officers Ass'n*, 173 A.3d 854, 858 (Pa. Cmwlth. 2017) (citing *Northumberland Cnty. Comm'rs v. Am. Fed'n of State, Cnty. & Mun. Emps., AFL–CIO Local 2016, Council 86*, 71 A.3d 367, 374 (Pa. Cmwlth. 2013)). The party challenging an arbitration award bears the "burden of proving the award does not draw its essence from the [collective bargaining agreement]." *See Pa. State Sys. of Higher Educ.*, 98 A.3d at 14.

However, even where an arbitration award satisfies the essence test, our Supreme Court has delineated a discreet exception whereby a reviewing court may still vacate the award if it violates public policy. *See Millcreek Twp. Sch. Dist. v. Millcreek Twp. Educ. Support Pers. Ass'n*, 210 A.3d 993, 1007-11 (Pa. 2019); *see also Westmoreland I*, 939 A.2d at 865. The application of this public policy exception requires that "[s]uch public policy . . . must be well-defined, dominant, and ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." *Westmoreland I*, 939 A.2d at 866. Additionally, unlike the deferential standard of review employed to review determinations under the essence test, appellate review of the public policy exception "lies in the proper application of the public policy exception to the essence test. This is a pure question of law; [the] standard of review is *de novo,* and [the] scope of review is plenary." *Phila. Hous. Auth. v. Am. Fed'n of State, Cnty. & Mun. Emps., Dist. Council 33, Local 934*, 52 A.3d 1117, 1121 (Pa. 2012). Further, our Supreme Court has expressly recognized that

> not only is the public policy exception "exceptionally narrow" in its own right, but it is also an exception to the essence test, which is itself a narrow exception to the

8

doctrine that arbitration awards are final and binding. A baseline recognition that the public policy exception is a narrow exception to a narrow exception must guide a reviewing court's analysis.

*Millcreek Twp. Sch. Dist.*, 210 A.3d at 1011 (internal citations omitted).

The Supreme Court has articulated a three-part test to determine the appropriate application of the public policy exception to the essence test. *See Millcreek Twp. Sch. Dist.*, 210 A.3d at 1011.

First, a reviewing court must identify precisely what remedy the arbitrator imposed. Next, the court must inquire into whether that remedy implicates a public policy that is well-defined, dominant, and ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests. Finally, the reviewing court must determine if the arbitrator's award compels the employer to violate the implicated policy, given the particular circumstances and the factual findings of the arbitrator.

*Id.* (emphasis, internal citations, and internal quotation marks omitted). The Supreme Court has further emphasized that "the arbitrator's interpretation of the contract controls during this entire analysis, which is only triggered upon the reviewing court's determination that the award satisfies the essence test, and should be upheld absent a clear violation of public policy." *Id.* Moreover, "[t]he burden is on the party that opposes the award to demonstrate that it violates public policy." *Id.*

The instant matter involves Article XVIII of the CBA, which states that "[t]he Employer has the right to discharge or suspend any employee for just cause." CBA at 34; R.R. at 233a. In reviewing the Arbitration Award, the trial court

9

determined that the essence test was satisfied because the issue in this case was within the terms of the CBA and the Arbitration Award was not without foundation in the CBA. *See* Trial Court Opinion at 11. Neither party disputes the trial court's conclusion that the essence test has been met. Therefore, the only question presently before this Court is whether the public policy exception to the essence test applies to this case. To make this determination, we review the facts of this case pursuant to the three-part *Millcreek* test.

1. *The precise remedy imposed by the arbitrator.*

The precise remedy imposed by the arbitrator for consideration in this matter was a reduction of Ruffner's termination to a three-day unpaid suspension with back pay. *See* Arbitration Award at 15.

2. *Whether the remedy implicates a well-defined, dominant public policy.*

Next, as the party that opposed the Arbitration Award, the County bears the burden of demonstrating that the Arbitration Award remedy implicates public policy. *See Millcreek Twp. Sch. Dist.*, 210 A.3d at 1011. As stated *supra*, in order for the public policy exception to the essence test to apply, the alleged public policy involved "must be well-defined, dominant, and ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." *Westmoreland I*, 939 A.2d at 866.

The County alleges that a well-defined public policy against prison officials allowing prisoner suicide exists and is applicable to this matter. *See* County's Brief at 16-21. To carry its burden of establishing the existence of this policy, the County directs the Court's attention to *Department of Public Welfare,*

10

*Farview State Hospital v. Kallinger*, 580 A.2d 887 (Pa. Cmwlth. 1990), which noted Pennsylvania's strong public policy against the commission of suicide in concluding that a prison could force feed an inmate on hunger strike to prevent his death, and 18 Pa.C.S. § 508(d), which justifies the employment of force by law enforcement to prevent the commission of a crime or a suicide.[8]  The trial court also cited *Kallinger* to note the existence of a well-defined, dominant policy seeking to prevent prison suicide.  *See* Trial Court Opinion at 11-12.  While it attempts to distinguish the facts of *Kallinger* from the instant matter, the Union does not argue that a public policy seeking the prevention of suicide by inmates does not exist, *see* Union Brief at 33-39, and we have little trouble agreeing that such a well-defined, dominant policy exists in Pennsylvania.

3. *Whether the Arbitration Award compels violation of a well-defined, dominant public policy.*

The crux of whether the public policy exception to the essence test is applicable to the instant matter revolves around the third prong of the *Millcreek* test: whether the remedy fashioned by the arbitrator violated, or would cause the County

---

[8] 18 Pa.C.S. § 508(d) provides, in relevant part:

**(d) Use of force to prevent suicide or the commission of crime--**

(1) The use of force upon or toward the person of another is justifiable when the actor believes that such force is immediately necessary to prevent such other person from committing suicide, inflicting serious bodily injury upon himself, committing or consummating the commission of a crime involving or threatening bodily injury, damage to or loss of property or a breach of the peace
. . . .

18 Pa.C.S. § 508(d).

to violate, the well-defined, dominant public policy seeking to prevent prison suicide.  We find that it does not.

As this Court has explained:

[C]ourts are to give arbitration awards deference and are not to second-guess an arbitrator's findings of fact or interpretations.  But these awards are not entitled to a level of devotion that makes a mockery of the dominant public policy . . . .

*Neshaminy Sch. Dist. v. Neshaminy Fed'n of Tchrs.*, 171 A.3d 334, 340 (Pa. Cmwlth. 2017) (internal citations and quotation marks omitted).  In evaluating whether an arbitration award violates a dominant public policy, reviewing courts consider "both aggravating and mitigating factors in determining whether an award poses an unacceptable risk that a clear public policy will be undermined if the award is implemented."  *Id.* (internal quotation marks and brackets omitted); *see also Pa. State Sys. of Higher Educ., Lock Haven Univ. v. Ass'n of Pa. State Coll. & Univ. Faculties*, 193 A.3d 486, 500 (Pa. Cmwlth. 2018) (same).  Courts have found arbitration awards properly vacated pursuant to the public policy exception to the essence test in cases where, despite proven explicit and continuous conduct amounting to sexual harassment in contravention of Pennsylvania's public policy against such harassment, arbitration remedies imposed very little punishment.  *See Neshaminy Sch. Dist.*, 171 A.3d at 343 (20-day suspension with back pay violated public policy against sexual harassment); *see also Phila. Hous. Auth.*, 52 A.3d at 1128 (award granting immediate reinstatement with back pay in the face of "egregious" conduct amounting to sexual harassment makes a mockery of public policy against sexual harassment).  When considered in the light of the very specific

and unusual facts presented herein, the arbitrator's award does not make a mockery of the dominant policy to prevent prisoner suicide.

In explaining the Arbitration Award remedy in relation to Ruffner's failure to immediately initiate lifesaving measures on the prospective inmate suicide, the arbitrator, as the finder of fact, stated as follows:

> After cutting down the inmate, [Ruffner] left the cell to call for the ADON and then waited outside of the cell for the ADON to arrive. The surveillance evidence documents that he did not attempt to start CPR on his own, despite policies and training that required him to immediately start CPR on an inmate in need. [Ruffner's] explanation was that he believed the inmate to be deceased and that he was waiting for the ADON to arrive. With the County's policies and training requiring immediate CPR or First Aid, the question is whether [Ruffner's] explanations excuse his failure to immediately act.
>
> The surveillance evidence documents that after cutting down the inmate, [Ruffner] began waiting for the ADON outside the cell at 9:49:47 a.m. Despite being in the unit and aware of the medical emergency, the ADON responded casually, taking 1 minute and 23 seconds to make his way to the inmate's cell by 9:51:10 a.m. The County determined this delay to be totally unacceptable, with the ADON being discharged for his callous conduct and neglect of duty. With the ADON being held responsible, the County cannot fully blame [Ruffner] for the same conduct. As a Corrections Officer, [Ruffner] was not medical personnel. He also knew the ADON was in the unit. While his training required him to immediately begin CPR on his own, the amount of time that he would have conducted CPR would have been very brief had the ADON acted appropriately. Moreover, he cannot be blamed for any failure after the ADON arrived in the cell, as he justifiably relied upon the ADON's handling of the medical situation.

13

Upon entering the cell, [Ruffner] saw the inmate and believed him to be deceased. [Ruffner] is not medical personnel and his testimony as to his belief is accepted as credible. As explained by the [Allegheny County] Jail's Medical Director, [] the inmate might have been brain dead at that time, as it is difficult to determine exactly when that occurred. Nevertheless, [Ruffner's] training required him to immediately begin CPR and he did not do so. However, when this conduct is considered in conjunction with that of the ADON, it is more understandable. The ADON was on the unit and an emergency call made. The undersigned is convinced that had the ADON acted appropriately, CPR would have been initiated in a timely fashion such that [Ruffner] would not have been terminated, as his error was more one of judgment and not willful misconduct or neglect of duty.

Arbitration Award at 14-15. Based on this assessment of the facts of the matter, the arbitrator determined Ruffner should be reinstated with a three-day suspension, subject to required training to be determined by the County. *See id.* at 15.

The trial court found that the arbitrator's assessment of the evidence was "seriously flawed" in relation to the remedy imposed. Trial Court Opinion at 12. Specifically, the trial court took issue with the arbitrator's consideration of the ADON's actions during this event, which the trial court viewed as completely separate from Ruffner's actions. *See id.* at 12-13. On balance, the trial court found that "[d]ocking [Ruffner] three days['] pay [] is virtually no penalty under these circumstances[,]" and found that "[s]uch an award poses an unacceptable risk of undermining the well-defined public policy against suicide." Trial Court Opinion at 13-14.

We do not agree with the trial court's assessment of the Arbitration Award under the unique circumstances of this case. Events such as these do not

14

occur in a vacuum. While we appreciate the trial court's observation that both Ruffner and the ADON can be individually blamed for their individual conduct, *see* Trial Court Opinion at 12-13, holding both Ruffner and the ADON individually responsible for their own conduct does not require, as the trial court seems to suggest, that the conduct of each must be viewed in isolation. If we lived in a black and white world of absolutes, cases involving proven technical violations of prison rules and/or procedures would never require arbitrators to fashion awards other than termination or complete reinstatement with back pay. However, the arbitration process allows arbitrators to modify disciplinary penalties and fashion appropriate awards based on the specific facts of a given case. *See Sch. Dist. of Phila. v. Com. Ass'n of Sch. Adm'rs, Teamsters Local 502*, 160 A.3d 928, 934 (Pa. Cmwlth. 2017) (noting that arbitrators maintain authority to modify disciplinary penalties imposed). This is what occurred here – the arbitrator reviewed the unique facts and fashioned an award to suit those specific facts.

We agree with the arbitrator that an assessment of the ADON's presence and behavior during the incident was pertinent to consider in determining Ruffner's culpability and, therefore, in fashioning an appropriate remedy. The ADON was not far away somewhere else in the prison, but instead was right there on the cellblock, a fact that was known to Ruffner. The ADON's presence helps to explain Ruffner's inaction and represents a significant mitigating factor in determining an appropriate remedy.

Ruffner also testified that he thought the inmate was already dead upon cutting him down with the cut-down tool.[9] The arbitrator credited this testimony.

---

[9] Ruffner testified:

> Once I got the keys I went back into the cell and cut him down. [The inmate] landed on his face on the bottom bunk.

15

*See* Arbitration Award at 14. Notwithstanding the trial court's sweeping and unsupported statement that "[i]t is common knowledge that a person appearing lifeless is potentially revivable[,]" Trial Court Opinion at 13, Ruffner's credited belief that the inmate was deceased provides further mitigation for his failure to commence CPR and/or First Aid. Allegheny County Jail Policy 304 Section 8 calls for corrections officers to initiate lifesaving measures "if needed," and Section 15 requires corrections officers to immediately initiate CPR and/or First Aid "as appropriate." *See* Allegheny County Jail Policy 304, *supra* note 3. Conducting CPR

---

> At that point I grabbed [the inmate], flipped him onto his back, and placed him onto the ground.
>
> His eyes were popped out of his head, his chest was expanded, and his stomach looked like it didn't have anything in it. I was under the assumption he was dead when I cut him down.
>
> I smacked him in his arm trying to get a response from him, but it was eyes open staring at the ceiling, no breathing, nothing.
>
> At that point I exited the cell and stood outside waiting for the ADON because I knew he was on the pod. I yelled down to [the other officer who was present] and said where's the ADON, and he yelled over to the corner to the ADON and said you need to get upstairs.
> . . . .
>
> At that point [upon the discovery of the inmate] I'm under the assumption he's dead, just the lifelessness of him in my opinion, and I'm immediately looking for the ADON because I knew he was there and knew that somebody with more medical knowledge was on the pod, somebody that had more than two hours of training, video experience, was on the pod, and I was looking for that person and trying to get [the other officer who was present] to get that ADON to come upstairs and he was trying, and even [a third officer] yelled to [the ADON] to hurry to get upstairs.

Notes of Testimony, September 19, 2018 at 162-64; R.R. at 165a-67a.

16

on a deceased individual would be futile, and therefore arguably neither "needed" nor "appropriate." Ruffner's failure to immediately commence CPR on the inmate, although ultimately incorrect, arguably comported with the mandates of the prison policies to the extent it was based on his belief that the inmate was already deceased.

Given the unique facts of the instant matter, the Arbitration Award does not make a mockery of the public policy seeking to prevent prisoner suicide. The arbitrator considered the testimony and evidence before her and thoughtfully explained her decision based on the specific facts of this case. While a well-defined, dominant public policy against prisoner suicide exists, in consideration of the unique facts as found by the arbitrator, we cannot say that the remedy in this case, although not the same as what the trial court would have fashioned in assessing the same facts, violates public policy or requires the County to do so. Accordingly, the trial court improperly applied the public policy exception to the essence test in this matter.

Additionally, we note that *Philadelphia Housing Authority* is readily distinguishable from the instant matter, as that case involved an employee whose "lewd, lascivious and extraordinarily perverse" conduct toward a co-worker without question amounted to sexual harassment. *See Phila. Hous. Auth.*, 52 A.3d at 1124-25. In *Philadelphia Housing Authority*, the Supreme Court reviewed relevant federal sexual harassment case law and recognized the existence of an explicit, well-defined, and dominant public policy against workplace sexual harassment. *Id.* at 1123, 1127-28. The Supreme Court then found that the arbitration award that reinstated the offending employee with full back pay violated that well-defined, dominant public policy against sexual harassment. *See id.* The Supreme Court noted:

17

> To allow an arbitration award which finds that an employee engaged in "extraordinarily perverse" physical sexual harassment of a co-worker, yet then simply dismisses the conduct as unworthy of an employer response beyond initial "counseling," and reinstatement with back pay, would eviscerate the ability of employers to enforce dominant public policy.

*Id.* at 1125. The majority concluded that, considering the "egregious" nature of the employee's conduct, the arbitrator's award reinstating him "[made] a mockery of the dominant public policy against sexual harassment." *Id.* at 1128.

Ruffner's actions and the remedy fashioned by the arbitrator herein are simply not comparable to the actions of the employee or the remedy in *Philadelphia Housing Authority*. Ruffner did not repeatedly and knowingly violate public policy. His actions in not commencing CPR, although ultimately incorrect in regard to Allegheny County Jail policy, can be easily understood when Ruffner's credited belief that the inmate was deceased is coupled with the presence of a more qualified medical professional on scene whose arrival Ruffner thought was imminent. A three-day unpaid suspension for a negligent error of judgment under the particular circumstances of this case in no way eviscerates the County's ability to enforce the public policy to protect against prisoner suicide. *See Phila. Hous. Auth.*, 52 A.3d at 1125. The serious nature of the tragic death of the inmate in this matter notwithstanding, unlike the reinstatement without other consequences awarded in *Philadelphia Housing Authority*, the Arbitration Award imparts a meaningful penalty that is properly calibrated to Ruffner's level of culpability as determined by the arbitrator in this matter.

For these reasons, we reverse the Trial Court Order and reinstate the award of the arbitrator reducing Ruffner's termination to a three-day suspension with back pay.

_____
CHRISTINE FIZZANO CANNON, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

County of Allegheny, Pennsylvania :
                                :
            v.                 :
                                  :
Allegheny County Prison :
Employees Independent Union, : No. 122 C.D. 2020
                Appellant :

## O R D E R

AND NOW, this 10th day of November, 2020, the January 23, 2020 order of the Court of Common Pleas of Allegheny County is REVERSED. The arbitration award dated January 10, 2019 is REINSTATED.

 

_____
CHRISTINE FIZZANO CANNON, Judge