IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Pennsylvania State System          :
of Higher Education,               :
              Petitioner          :
                           :
              v.                   :  No. 2242 C.D. 2013
                           :  Argued:  June 16, 2014
Association of Pennsylvania State   :
College and University Faculties,   :
              Respondent          :


BEFORE:    HONORABLE BONNIE BRIGANCE LEADBETTER, Judge
                HONORABLE ROBERT SIMPSON, Judge
                HONORABLE MARY HANNAH LEAVITT, Judge


OPINION
BY JUDGE LEAVITT                            FILED: August 14, 2014

      The Pennsylvania State System of Higher Education, Kutztown University, petitions for review of an arbitration award holding that the University violated a collective bargaining agreement by assigning librarians the duty of providing academic advice to students.  University asserts that the Arbitrator impermissibly relied on past practices, improperly inserted new terms into the collective bargaining agreement and disregarded its managerial rights.  We affirm.

      University is one of 14 public universities operated by the Pennsylvania State System of Higher Education (State System).  The Association of Pennsylvania State College & University Facilities (Union) is the collective bargaining representative for all of the universities that comprise the State System. The State System has negotiated a series of collective bargaining agreements that

span several decades, and each agreement covers all the public universities in the State System.

University employs ten full-time librarians, who are treated as faculty under the relevant collective bargaining agreement for 2007-2011 (CBA). In 2010, University closed its academic advising center for financial reasons. In 2011, University sought to replace the function of the closed center by assigning 60 students to each librarian for academic advising. It did so with the proviso that academic advising would fall within the librarian's 35-hour work week set forth in the CBA. Union filed a grievance to challenge this assignment. At the hearing, the parties stipulated that the issue before the Arbitrator was whether University "violate[d] the [CBA] by assigning librarians to academic advising duties." Reproduced Record at 5a (R.R. __).

Ruth Perkins, a librarian and 15-year Union representative, testified. She explained that the CBA governed both teaching faculty and non-teaching faculty, such as librarians, at University. Article 23 of the CBA assigned duties to "administrative faculty" and to "academic faculty." CBA, Article 23; R.R. 256a, 259a. Academic faculty includes both "teaching faculty"[1] and "library faculty,"[2]

---

[1] Article 23.A.1.a-g of the CBA establishes the workload for the teaching faculty. Generally, teaching faculty members are not to exceed 24 workload hours per week. Also, no more than 3 preparations per academic term are to be assigned. An additional preparation may be assigned if overload pay is provided. Further, teaching faculty members are to maintain a minimum of 5 office hours per week on no fewer than 3 different days. Separate instructions for teaching graduate classes, supervising student interns, and supervising student teachers are provided.

[2] Article 23.A.2.a-d of the CBA establishes the workload for the library faculty, as follows:

a. Subject to the provisions hereof, all members of the professional library staff shall enjoy full FACULTY status with all the rights, privileges and responsibilities pertaining thereto. For administrative purposes, the professional librarians shall constitute a department.

**(Footnote continued on the next page . . . )**

2

and each have different "workload and workload equivalents." R.R. 256a-59a. Because the teaching faculty must have office hours, their weekly workload must not exceed 24 hours, unless they are given "overload" pay. R.R. 256a. Librarians do not keep office hours, and they do not have the opportunity for overload pay. Likewise, teaching faculty have duties involving internships and the supervision of student teachers, which librarians do not share.

Article 4 of the CBA addresses the duties of faculty members.[3] Article 4.A emphasizes that the "universal responsibility of the teaching

---

**(continued . . . )**

    b. Library FACULTY in the performance of their duties shall be scheduled for no more than thirty-five (35) hours per week, and Library FACULTY also shall be expected, as are other FACULTY MEMBERS, to assume committee assignments and other campus responsibilities.

    c. A Library FACULTY MEMBER'S schedule shall be based on library needs as determined by the President or his/her designee in consultation with members of the Library FACULTY.

    d. [election of chairperson].

CBA, Article 23.A.2.a-d; R.R. 258a-59a.

[3] It provides:

A. The concept of academic freedom must be accompanied by an equally demanding concept of academic responsibility. The concern of the UNIVERSITIES and its members for academic freedom safeguards must extend equally to requiring responsible service, consistent with the objectives of the UNIVERSITIES. *The universal responsibility of the teaching FACULTY MEMBER is effective teaching.*

B. A proper academic climate can be maintained only when members of the FACULTY meet their fundamental duties and responsibilities regularly. These duties and responsibilities include but are not limited to: reporting promptly, and in advance if possible, any changes in class hours or classrooms assigned; preparing for and meeting their assignments, which would include timely notification of the proper authority and making a reasonable effort to insure that assignments can be covered in case of absences; making a reasonable effort to notify students of any changes in class hours or classrooms assigned; keeping current in their academic disciplines through continuing scholarly activity;

**(Footnote continued on the next page . . . )**

FACULTY MEMBER is effective teaching." CBA, Article 4.A; R.R. 188a. Article 4.B then lists the specific duties of the teaching faculty, such as making classroom assignments; keeping office hours; and "advising students." CBA, Article 4.B; R.R. 188a.

Perkins explained that Article 16 of the CBA[4] requires written job descriptions for those faculty members, such as librarians, who have responsibilities that lie outside of the classroom and for faculty members with mixed workloads. These written job descriptions are used to evaluate these faculty

---

**(continued . . . )**

> *keeping office hours in accordance with Article 23 WORKLOAD AND WORKLOAD EQUIVALENTS, and conferring with and advising students and advisees*; evaluating fairly and reporting promptly student achievement; rendering service to the University which would include participating in group deliberations which contribute to the growth and development of the students and the UNIVERSITIES; and reporting promptly, and in advance if possible, absence from any assigned duty in accordance with the provisions of Article 17, SICK LEAVE….

CBA, Article 4.A-B; R.R. 188a (emphasis added).

[4] Article 16 is entitled "PROMOTIONS." It provides in relevant part:

> A. Qualifications and Categories for Evaluation
>
> > 1. The minimum qualifications for ranks shall be as specified in the applicable laws.
> >
> > 2. In addition to the required minimum qualifications, categories for FACULTY promotions shall include, but not be limited to, the categories identified in Article 12, Section B., PERFORMANCE REVIEW AND EVALUATION OF FACULTY.
> >
> > 3. Effective July 1, 2000, each University shall provide written job descriptions for all FACULTY MEMBERS whose basic responsibilities lie outside the classroom and for the nonclassroom responsibilities of FACULTY MEMBERS with mixed workloads. This official job description shall be the basis of the evaluation of these FACULTY MEMBERS in lieu of effective teaching….

CBA, Article 16.A.1-3; R.R. 220a.

members "in lieu of effective teaching," the evaluation criterion for teaching faculty. CBA, Article 16; R.R. 220a. In this way, Article 16 highlights that librarians do not perform the "effective teaching" duties set forth in Articles 4 and 23 of the CBA.

Perkins stated that Article 23 of the CBA limits librarians to a 35-hour work week and directs that a librarian's schedule shall be based on "library needs." Perkins maintained that a "library need" cannot be construed to include advising students on their academics.

In all the years Perkins worked at the library, no librarian had ever been assigned academic advising duties. When Perkins began employment at University, she went through an orientation for new faculty members. Perkins signed up for the orientation session on how to advise students, and she was not allowed to attend. She was informed that as a librarian, she could not provide academic advice to students.

In 2001, University asked for volunteers to teach a studies class. Perkins volunteered and taught the class. In every other studies class, the teacher was also the advisor to the students. Perkins was not permitted to be an advisor to the students in her class; rather, a teaching faculty member was assigned that position. Again, Perkins was advised that librarians could not advise.

On April 8, 2011, the librarians received notice from the University's Vice Provost for Academic Affairs and the Dean of Library Services that, beginning in the Fall 2011 semester, they would advise all incoming freshman students who had not declared a major. Accordingly, University assigned approximately 60 students to each librarian for that semester, for which it provided training. In addition, University revised the librarians' job descriptions to include

5

student advising. Perkins explained that her job description from 2002 to 2011 had listed library duties and never mentioned academic advising. The 2012 job description listed the same library duties as prior years but added the new duty of providing academic advice to students without a declared major.

Perkins testified that the librarians protested this assignment to Dr. Carlos Vargas, Provost and Vice-President for Academic Student Affairs. He conceded that these assignments might adversely affect the level of library services. However, he explained that the administration was willing to accept a reduction in library services as a trade-off for ensuring that students would receive assistance they needed in course and major selection. The librarians asked for additional staff or clerical support, but none was provided.[5] Perkins also noted that at one point the library had 13 full-time librarians, but by 2010 that number had been reduced to ten.

Perkins was critical of the training provided by University. The training materials were dense with information that the librarians were expected to learn on their own. Because the students were unsure of their major, course selection could not be based on a particular field of study. Reviewing a student file, preparing for an interview and documenting everything done took approximately one hour per student; e-mails and phone calls added another half-hour per student. Perkins testified that advising students has adversely impacted library services.

Vera Brancato, a professor *emeritus* at University, testified for Union. Prior to retirement, she had been the Chair of Academic Advising and Director of

---

[5] In additional to the 10 librarians, the library has 10 support staff personnel.

6

the Advising Center. She stated that giving academic advice to students without a declared major is challenging. The process begins by helping students develop awareness of their strengths, their interests, their value system and their weaknesses. Only then can the advisor provide relevant advice on which courses at University will fit the student's interests and needs. Dr. Brancato worked at University for 27 years; never did librarians advise students. She opined that academic advising falls outside the competence of a librarian. National standards provide that an academic advisor must be competent and have broad knowledge in occupational and professional requirements, the college curriculum requirements and what courses are necessary to a particular major. Librarians do not have this scope of knowledge.

Stephanie Steely, the University's Coordinator of Technical Services and Collection Development, also testified. When the issue of academic advising arose in 2010, she surveyed the other 13 universities in the State System. She found that no other university required librarians to advise students, although some universities permitted it on a voluntary basis. At Millersville, each librarian advised six or seven students a semester on a voluntary basis.[6]

Dr. Vargas was the sole witness for University. He testified that the idea of assigning librarians to do academic advising first arose in 2008 at the suggestion of Ted Hickman, a librarian and Union representative. In 2010, it was again raised, and a number of librarians expressed support for the idea of advising students because it would increase the visibility and the role of librarians on campus. When the academic advising center closed in 2010, the librarians were

---

[6] Karen Wanamaker, the outreach librarian, testified regarding the many duties involved in operating the library. She contended that it was difficult to fit advising in with these duties.

7

assigned academic advising. Regarding the impact of this new assignment, Vargas felt that the librarians could best decide what library functions could be reduced to make time for advising students. He added that no librarian was ever scheduled to do advising work outside of the 35-hour work week.

## Arbitration Award

The Arbitrator considered the long history of contract negotiation and application. Never had either party considered the CBA to authorize a university in the State System to assign librarians to academic advising. None of the other State System universities had ever assigned librarians the job of offering academic advice. The Arbitrator concluded that such history may fairly be viewed as evidence of the parties' understanding of the CBA.

However, the Arbitrator went on to examine the CBA to see if it gave a right to management to assign librarians the duty of providing students academic advice. He found none. The Arbitrator explained that Article 4.A of the CBA stresses that the universal responsibility of the *teaching* faculty is "effective teaching," and it makes one of the components of "effective teaching" to be "conferring with and advising students and advisees." CBA, Article 4.A-B; R.R. 188a. The Arbitrator concluded that Article 4.B established that advising students is a contractual duty of the teaching faculty.

The Arbitrator rejected University's argument that Article 12.B of the CBA, which addresses the quality of student advising, applies to all faculty members. Article 12.B.1 is entitled "Effective teaching and fulfillment of professional responsibilities." The Arbitrator found the title itself established that Article 12.B was directed to the teaching faculty not the library faculty.

8

Article 23.A.2.c states that the schedule of a librarian "shall be based on library needs as determined by the President or his/her designee in consultation with members of the Library FACULTY." CBA, Article 23.A.2.c; R.R. 258a. University argued that it was a management prerogative to determine library needs, and it determined that a "library need" included advising students. The Arbitrator rejected this construction because the "need" arose when University closed the academic advising center, not the library. Even if management has the prerogative to determine library needs, this new assignment to librarians actually subverted the needs of the library, as acknowledged by University's witness, Dr. Vargas.

Based on these findings, the Arbitrator concluded that University violated the CBA by assigning librarians the job of providing academic advice and directed University to cease and desist from making these assignments. The Arbitrator declined to award a monetary remedy, finding that University did not direct the librarians to work beyond the contract 35-hour per week maximum and, further, there was no evidence that any librarian did so.

## Appeal

University then petitioned for this Court's review. On appeal, University argues (1) that the Arbitrator's award was unfaithful to the CBA because it relied on past practices as justification to disregard the managerial rights clause reserved in Article 10 of the CBA; (2) that the Arbitrator improperly inserted new and additional terms into the CBA as justification to disregard managerial rights; and (3) that the Arbitrator's award violated a well-defined, dominant public policy of the Commonwealth.

9

Our scope and standard of review of an arbitrator's award is narrow and deferential. When reviewing an arbitrator's interpretation of a CBA, the proper scope of review is the deferential essence test:

> The essence test is a two prong test under which an award should be upheld if (1) the issue as properly defined is within the terms of the [CBA] and (2) the arbitrator's award can be rationally derived from the [CBA].

*Coatesville Area School District v. Coatesville Area Teachers' Association/Pennsylvania State Education Association*, 978 A.2d 413, 415 n.2 (Pa. Cmwlth. 2009). In short, we do not review an arbitrator's findings of fact on appeal, "and as long as he has arguably construed or applied the [CBA], an appellate court may not second-guess his findings of fact or interpretation." *Id*. We may only vacate an award if "it is indisputably without foundation or fails to logically flow from the agreement." *Id*.

## Analysis

In its first issue, University argues that the Arbitrator's award is unfaithful to the CBA because it relies on past practices as justification to disregard the managerial rights reserved to University in Article 10 of the CBA. University argues that this clause of the CBA gives it the authority to assign advising duties to the librarians. Article 10.A-C of the CBA sets forth the management rights clause:

> A. The STATE SYSTEM/UNIVERSITIES, at their sound discretion, possess the right, in accordance with applicable laws, to manage all operations including the direction of FACULTY and the right to plan, direct and control the operation of all facilities and property of the STATE SYSTEM, except as modified by this Agreement.
>
> B. As provided by Act 195 (Section 702), matters of inherent managerial policy are reserved exclusively to the STATE SYSTEM/UNIVERSITIES. These "include but shall not be

10

limited to such areas of discretion or policy as the functions and programs of the public employer (STATE SYSTEM/ UNIVERSITIES), standards of services, its overall budget, utilization of technology, the organizational structure and selection and direction of personnel."

C. The listing of specific rights in this Article is not intended to be or should not be considered restrictive or a waiver of any of the rights of management not listed and not specifically surrendered herein, whether or not such rights have been exercised by the STATE SYSTEM/UNIVERSITIES in the past.

CBA, Article 10.A-C; R.R. 202a. University notes that Article 10 of the CBA incorporates Section 702 of the Public Employe Relations Act (PERA), 43 P.S. §1101.702,[7] which relieves public employers of the duty "to bargain over matters of inherent managerial policy." Thus, it argues that the PERA and the CBA gave University the discretion to assign additional duties to its employees, including librarians. Further, it argues that "past practices" are not binding on a public employer unless that practice is subject to mandatory bargaining. University Brief at 29.

Union counters that University is not obligated to bargain over issues of inherent managerial prerogative, but if it chooses to do so, it is bound by the

_____

[7] Act of July 23, 1970, P.L. 563, *as amended*, 43 P.S. §1101.702. It provides:

*Public employers shall not be required to bargain over matters of inherent managerial policy*, which shall include but shall not be limited to such areas of discretion or policy as the functions and programs of the public employer, standards of services, its overall budget, utilization of technology, the organizational structure and selection and direction of personnel. Public employers, however, shall be required to meet and discuss on policy matters affecting wages, hours and terms and conditions of employment as well as the impact thereon upon request by public employe representatives.

43 P.S. §1101.702 (emphasis added).

11

terms of the CBA. Here, University has limited its managerial prerogatives and is bound by the CBA, which separates the work duties of teaching faculty and librarians. Specifically, the workload of teaching faculty is set forth separately from that of librarians. *See* CBA, Article 23.A.1-2; R.R. 256a-59a. Article 4 of the CBA delineates the requirements of "effective teaching" to include advising students. CBA, Article 4; R.R. 188a. In short, the University has bound itself to make the assignment of academic advising solely to teaching faculty.

This Court has explained that the PERA does not obligate a public employer to negotiate matters of "inherent managerial policy." *Pennsylvania Turnpike Commission v. Teamsters Local Union No. 77*, 87 A.3d 904, 910 (Pa. Cmwlth. 2014). However, "if [a public employer] chooses to do so, absent contrary positive legislation, it is bound by the terms of a [CBA]." *Id.* (quoting *Coatesville Area School District*, 978 A.2d at 417). The Arbitrator determined that the CBA limited University from assigning the task of advising students to any of its employees other than teaching faculty.

The Arbitrator's award must be upheld if it is rationally derived from the CBA. The Arbitrator analyzed the CBA in its entirety. University's past practices argument misses the point.[8] The Arbitrator based his decision on the

---

[8]Evidence of a past practice cannot be used if it conflicts with the current language of the CBA. *Department of Corrections v. Pennsylvania State Corrections Officers Association*, 38 A.3d 975 (Pa. Cmwlth. 2011). However, an arbitrator may use evidence of past practice as follows:

> (1) to clarify ambiguous language; (2) to implement contract language which sets forth only a general rule; (3) to modify or amend apparently unambiguous language which has arguably been waived by the parties; and (4) to create or prove a separate, enforceable condition of employment which cannot be derived from the express language of the agreement.

*Id*. at 981 (quoting *County of Allegheny v. Allegheny County Prison Employees Independent Union*, 381 A.2d 849, 852 (Pa. 1977)). Contrary to University's claim that use of past practices **(Footnote continued on the next page . . . )**

12

language of the CBA, and his discussion of past practices simply confirmed his construction of the CBA.

In its second issue, University argues that the Arbitrator's award fails the essence test because he did not confine his decision to the plain language of the CBA and instead inserted new terms into it. University argues the Arbitrator rewrote Article 4 of the CBA, which describes the job duties of "faculty" by inserting the word "teaching" before the word "faculty." Union counters that the Arbitrator did not add words to the CBA; he interpreted it. Article 4.A states that the universal responsibility of the *teaching* faculty members "is effective teaching." CBA, Article 4.A; R.R. 188a. Article 4.B then addresses the duty of "[a]dvising students." CBA, Article 4.B; R.R. 188a. Article 4.B must be read together with Article 4.A, which relates only to "teaching faculty members." CBA, Article 4.A-B; R.R. 188a. Further, the duty of advising students appears in a list of duties to report changes in class hours; office hours; and evaluation of student achievement. These duties can only apply to teaching faculty. Further, the instruction to confer with and advise students is a function of the requirement to "keep office hours." Since library faculty members are not required under the CBA to maintain office hours, it cannot apply to them. We agree with Union.

---

**(continued . . . )**
is impermissible, "reliance upon past practice in the face of an ambiguous contract provision is not only permissible, but is an important tool through which an arbitrator may discover the intent of the parties." *Danville Area School District v. Danville Area Education Association, PSEA/NEA*, 754 A.2d 1255, 1262 (Pa. 2000). In arguing against the use of "past practices," University cites to several decisions of the Pennsylvania Labor Relations Board. As noted by Union, the Pennsylvania Labor Relations Board does not interpret CBAs. Instead, it determines matters relating to violations of the PERA. Thus, the cases cited by University are irrelevant to the review of an arbitration award, which is governed by the essence test.

13

Notably, the Arbitrator's interpretation of Article 4 is bolstered by Article 12.B of the CBA, which states as follows:

B. Categories for Performance Review and Evaluation

The following categories shall serve as the uniform system-wide basis for the evaluation of FACULTY MEMBERS at each University. The categories listed below shall be applied in the performance review and evaluation of temporary faculty, regular part-time faculty, probationary non-tenured faculty, tenured faculty and all applications for promotion. Under each category are listed some examples of data upon which judgments can be made of the FACULTY MEMBER'S performance relative to a given category. When evaluating the data, the appropriate evaluator(s) shall give greater weight to the quality of the performance reflected in the data, than to the quantity of the data.

1. *Effective teaching* and fulfillment of professional responsibilities.

a. This will be indicated, when applicable, by such items as:

student evaluations, peer *evaluations*, quality of syllabi, classroom visitations, *quality of student advisement*, willingness to accept departmental work assignments, timely execution of work assignments, and any other data deemed appropriate and agreed to by the FACULTY and Administration at local meet and discuss.

\*\*\*

c. *For all FACULTY MEMBERS whose basic responsibilities lie outside the classroom, the duties and responsibilities of the position shall be the category instead of effective teaching*.

14

CBA, Article 12.B.1; R.R. 206a (emphasis added). As does Article 4, Article 12.B.1.a relates "student advisement" to "effective teaching" and is included with a list of duties that do not apply to librarians. Librarians represent the group of faculty members "whose basic responsibilities lie outside the classroom." CBA, Article 12.B.1.c; R.R. 206a.

An arbitrator's award must be sustained "if it is based on anything that can be gleaned as the 'essence' of the [CBA]." *American Federation of State, County & Municipal Employees, District Council 84, AFL-CIO v. City of Beaver Falls*, 459 A.2d 863, 865 (Pa. Cmwlth. 1983). An arbitrator cannot change the language of the CBA or add new provisions. *Id*. University's argument that the Arbitrator did so here does not withstand close scrutiny. The Arbitrator cited a number of provisions in the CBA and offered a reasonable construction of them. It is not necessary that this Court agree with an arbitrator's interpretation of a CBA for it to be sustained. *Coatesville Area School District,* 978 A.2d at 415 n.2. Simply, University has not met its burden of proving the award does not draw its essence from the CBA.

In its third issue, University argues that the Arbitrator's award violates a well-defined, dominant public policy of the Commonwealth that public employers should have discretion over matters of inherent managerial policy, as codified in Section 702 of the PERA, 43 P.S. §1101.702. University's direction to the librarians to advise students is a discretionary managerial right. Therefore, the Arbitrator's award violates the public policy exception to the essence test.

To establish the public policy exception to the essence test it must be shown that the public policy is "well-defined, dominant and ascertained by reference to the laws and legal precedents and not from general considerations of

15

supposed public interests." *Westmoreland Intermediate Unit #7 v. Westmoreland Intermediate Unit # 7 Classroom Assistants Educational Support Personnel Association, PSEA/NEA*, 939 A.2d 855, 866 (Pa. 2007). Further, an arbitrator's award will violate public policy if it "poses an unacceptable risk that it will undermine the implicated policy and cause the public employer to breach its lawful obligations or public duty, given the particular circumstances at hand and the factual findings of the arbitrator." *City of Bradford v. Teamsters Local Union No. 110*, 25 A.3d 408, 414 (Pa. Cmwlth. 2011).[9]

As stated above, a public employer is not statutorily required to negotiate matters of inherent managerial rights. *Pennsylvania Turnpike Commission*, 87 A.3d at 910. However, "if it chooses to do so, absent contrary positive legislation, it is bound by the terms of a [CBA]." *Id.* Herein, the Arbitrator determined that the CBA directed that the teaching faculty was given the task of advising students. Therefore, the task could not be given to the librarians. University does not claim that there is any "contrary positive legislation" that would prohibit this action. Therefore, the public policy exception has not been established and University is bound by the terms of the CBA.

### Conclusion

We affirm the Arbitrator's award because it is rationally derived from the CBA, flows from the essence of the CBA and does not violate public policy.

_____
MARY HANNAH LEAVITT, Judge

---

[9] Whether the award violates public policy is a question of law; our standard of review is *de novo* and the scope of review is plenary. *Pennsylvania Turnpike Commission,* 87 A.3d at 911.

16

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Pennsylvania State System :
of Higher Education, :
     Petitioner :
         :
    v.     : No. 2242 C.D. 2013
         :
Association of Pennsylvania State :
College and University Faculties, :
     Respondent :

# **O R D E R**

AND NOW, this 14th day of August, 2014, the arbitrator's award dated November 15, 2013, is AFFIRMED.

_____
MARY HANNAH LEAVITT, Judge