IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Department of Corrections,      :
                Petitioner      :
                        :
       v.                    :
                        :
Pennsylvania State Corrections      :
Officers Association,      :    No. 1611 C.D. 2024
                Respondent    :    Argued: December 8, 2025

BEFORE:    HONORABLE CHRISTINE FIZZANO CANNON, Judge
                HONORABLE LORI A. DUMAS, Judge
                HONORABLE MATTHEW S. WOLF, Judge

OPINION
BY JUDGE FIZZANO CANNON           FILED: January 27, 2026

The Commonwealth of Pennsylvania, Department of Corrections (DOC) petitions for review of an arbitrator's (Arbitrator) October 29, 2024 award (Arbitrator's Award) that sustained a grievance brought by the Pennsylvania State Corrections Officers Association (Union). The Arbitrator found that the DOC's practice of limiting leave opportunities for Community Corrections Center Monitors (Monitors) violated the parties' collective bargaining agreement. Upon review, we affirm.

## I. Background and Procedure

The underlying facts and procedure of this matter are relatively straightforward and not in dispute. The DOC and the Union[1] are parties to a Collective Bargaining Agreement (CBA) that governs the terms and conditions of Monitors' employment with the DOC. *See* Arbitrator's Award at 1, Reproduced

---

[1] The Union represents Monitors in collective bargaining with the DOC.

Record (R.R.) at 1525a. In December 2023, the Union brought a class action grievance alleging that the DOC's process for approving or denying Monitor leave requests violated Article 10, Section 2 of the CBA (Grievance). *See id.* The Grievance procedures failed to resolve the dispute, and the matter proceeded to arbitration consistent with the parties' practice. *See id.* at 2.

An Arbitrator conducted a hearing on the Grievance on July 18, 2024, at which the parties each presented multiple witnesses. *See* Arbitrator's Award at 2, R.R. at 1526a. Testimony at the hearing indicated that Monitors process incoming Wernersville residents, act as counselors to residents, attend to residents' basic needs in terms of supplying food and medicines, and conduct safety rounds of the facility throughout their shifts. *See* Arbitration Award at 2, R.R. at 1526a. Wernersville staffing depends on available personnel for any given day based on color-coded groups of Monitors rotating in three groups of personnel. *See id.* at 3, R.R. at 1527a. Specifically, the Monitor groups are Red, Green, and Blue, with the three groups rotating their two scheduled days off per week with one another, taking into account one "white day" every seven days, which requires the presence of all staff, and one "white weekend" every six weeks, which also requires the presence of all Monitors. *See id.* Vacation selection for Monitors is based on seniority, with the more senior Monitors receiving first pick for requested vacation days. *See id.* Annual vacation selection occurs in two distinct windows, first in November for the first three months of the following calendar year, and then again in February or March for the remainder of the year. *See id.* Monitors may also request prescheduled leave within a 15-day window, with seniority determining requests made outside such window. *See id.* Leave requests made within 15 days are granted on a first-come, first-served basis. *See id.* Seniority and operational needs present the only restrictions on leave

2

requests, provided the requests do not result in overtime. *See* Arbitration Award at 3-4, R.R. at 1527a-28a. Wernersville is currently short on workers, and overtime considerations in relation to the approved vacation leave requests of others present the primary restriction on vacation leave requests at Wernersville. *See id.* Staff training days further limit vacation leave options for Wernersville. *See* Arbitration Award at 4, R.R. at 1528a.

Prior to 2011, vacation selection for Union members was based solely on seniority, without consideration of shift or other classifications. *See* Arbitration Award at 4-5, R.R. at 1528a-29a. This historical practice was applied consistently over multiple institutions without regard to the existence or nonexistence of supplemental or side agreements. *See* Arbitration Award at 5, R.R. at 1529a. However, under the CBA introduced in 2011, the leave system shifted to a more structured model, with leave requests scheduled pursuant to shift and classification. *See id.* This change in leave request approval policy is reflected in the language of CBA Article 10 as well as a 2011 arbitration decision. *See id.* Under the current leave request system, each institution now manages leave requests on a shift-specific basis, meaning that leave requests for specific shifts do not carry over to other shifts unless explicitly permitted by the policies of the given institution. *See* Arbitration Award at 5, R.R. at 1529a.

The DOC applies its leave policies uniformly within its institutions, absent specific side letters or institutional agreements. *See* Arbitration Award at 6, R.R. at 1530a. Leave selection and allocation issues remain a focus of contract negotiations with the DOC. *See id.* However, no Monitor-specific proposals have been presented during recent contract negotiations. *See id.*

3

A side letter to the CBA executed in 1988 (Side Letter) intended to ensure that Union members could use accrued leave throughout the year. *See* Arbitration Award at 5, R.R. at 1529a. However, the Side Letter did not affect the shift-based leave structure established by the CBA. *See id.* Moreover, multiple previous arbitration awards contributed to the evolution of DOC leave practices, including those known as the Schick Award, the Wolf Award, and the DeTreux Award, which specifically introduced the shift- and classification-based leave selection process that has since become standard. *See* Arbitration Award at 5-6, R.R. at 1529a-30a.

The Grievance in this matter resulted from discrepancies identified in the DOC's leave approval process in reference to Community Corrections Centers (CCCs), including identified patterns of leave denials inconsistent with other DOC institutions and/or previous agreements. *See* Arbitrator's Award at 7, R.R. at 1531a. Facilities' operational needs, which are determined by the management of various facilities, often influence the approval/denial of leave requests. *See* Arbitration Award at 9, R.R. at 1533a. CCCs require minimum staffing per shift, and factors such as parolee reentry or transportation requirements may impact staffing requirements. *See id.* Further, leave request approvals are not guaranteed under the terms of the CBA. *See id.* However, the CCC leave denial rates were unusually high when compared to other DOC institutions. *See id.*

The Union's investigation following the filing of the Grievance revealed a stark contrast between leave denials at CCCs and leave denials at other DOC institutions. *See* Arbitrator's Award at 7, R.R. at 1531a. The investigation also revealed inconsistencies in the application of leave policies within specific

4

CCCs and in comparison to other, similarly situated CCCs. *See* Arbitrator's Award at 7-8, R.R. at 1531a-32a.

The Grievance illuminated discrepancies between claimed long-standing leave request policies and actual leave approval practice. *See* Arbitrator's Award at 8, R.R. at 1532a. Instead of allowing one leave slot per shift per day for employees as stated in the policies, what was occurring in practice was that once a vacation slot was granted to a shift on a given day, the remaining available slots were reduced to only one additional slot per day. *See id.* This practice prevented other employees from using what should have been available slots and created significant difficulty for employees seeking leave after the completion of the pre-scheduled selection process. *See id.* This shift in practice from one slot per shift to one slot per day represented a deviation from prior agreements between the DOC and the Union. *See id.*

When staffing at CCCs drops below established required minimums, the CCC must report the staffing shortfall in compliance with the Prison Rape Elimination Act (PREA).[2] *See* Arbitration Award at 10, R.R. at 1534a. The Monitor leave request process allows each Monitor two initial picks for leave weeks as outlined in Article 10 of the CBA. *See* Arbitration Award at 11, R.R. at 1535a. Following the initial picks, Monitors are allowed to schedule an additional leave slot, subject to availability and operational needs. *See id.* The DOC continues to abide by the leave slot selection portion of a prescheduled leave agreement entered into between the Union and the DOC in 2013, although the Union later exited that agreement. *See* Arbitration Award at 11, R.R. at 1535a. The DOC continued this practice to ensure continuity of operations after the Union left the agreement, as the

_____

[2] 34 U.S.C. §§ 30301-30309.

leave slot selection process was effective and violated no provisions of the CBA. *See id.*

Regarding CCC staffing challenges, staffing can fall below minimums. *See* Arbitration Award at 11-12, R.R. at 1535a-36a. Such shortages are covered by voluntary overtime shifts and, if necessary, mandatory overtime shifts. *See id.* The COD stressed the importance of balancing operation needs with staff availability in an effort to maintain security at CCCs while avoiding unnecessary personnel overtime pay costs. *See id.* Maintaining safe operations at CCCs presented difficulties for DOC considering the staff complement at the various facilities and possible reductions of those numbers for various forms of leave, such as Family Medical Leave Act[3] (FMLA) leave and military leave. *See* Arbitration Award at 13, R.R. at 1537a. The need to operate CCCs safely and in compliance with operational standards remains despite any reductions in staff, and additional Monitor leave requests can sometimes be difficult to approve without risking facility safety. *See id.*

The vacation request process for Monitors is governed by the CBA, which requires vacation requests to be made during two rounds: November 1 through December 31 for vacation selections through March of the following year and January 1 through March 31 for vacation requests from April 1 through the end of the calendar year. *See* Arbitration Award at 13-14, R.R. at 1537a-38a. The vacation selection process is based on Monitor seniority level as well as the shift and location for which the request is made, with all locations being limited to one vacation slot per shift each day. *See* Arbitration Award at 14, R.R. at 1538a. Non-scheduled leave types such as FMLA leave, work-related injury leave, and military

---

[3] 29 U.S.C. §§ 2601-2654.

leave do not affect designated leave slots. *See id.* Additionally, some personnel do not pre-schedule leave, opting instead to request leave on an *ad hoc* basis, which is then granted or denied based on operational requirements. *See id.* The DOC conceded that there were times where leave that was denied based on operational efficiency reasons but should properly have been granted. *See* Arbitration Award at 15, R.R. at 1539a.

The Arbitrator sustained the Grievance on October 29, 2024. *See* Arbitrator's Award at 26, R.R. at 1550a. The Arbitrator first found the Grievance was timely as being filed in response to a continuing DOC practice. *See* Arbitrator's at 21-22, R.R. at 1545a-46a. Regarding the merits, the Arbitrator found that the DOC's practice of limiting Monitor leave at a CCC to one slot per day violates the CBA and the 1988 Side Letter that guaranteed sufficient leave opportunities to DOC personnel. *See* Arbitrator's Award at 25-26, R.R. at 1549a-50a. Ultimately, the Arbitration Award directed the DOC to:

> (1) Cease and desist applying the one-slot-per-day leave restriction for [Monitors]; (2) Ensure that all prescheduled leave requests are considered based on bargaining unit seniority, with operational efficiency considered only when specific and demonstrable needs require a denial of leave; and (3) Provide sufficient opportunities for [Monitors] to use their earned leave in a manner consistent with the [CBA] and the [S]ide [L]etter.

Arbitration Award at 26, R.R. at 1550a.

## II. Issues

Before this Court, the DOC claims that the Arbitrator's Award must be vacated because it is not rationally derived from the CBA despite the issue being clearly covered by the CBA. The DOC also contends that the Union was not entitled

7

to relief because it knew about the DOC's leave practices for a decade but did not timely file a grievance within the contractual timeframe specified in the CBA. The DOC further asserts that the Arbitration Award imposed a new evidentiary standard that requires the DOC to illustrate specific and demonstrable operational needs to deny Monitor leave requests, which standard is not present in the CBA. The DOC also maintains that the Arbitrator erred by applying the Side Letter to Monitors, arguing that the Side Letter expressly addresses leave opportunities for Corrections Officers and Psychiatric Security Aides, but not Monitors. Finally, the DOC posits that the Arbitrator ignored longstanding and binding past practice between the parties that governs leave approval, which past practice the Union failed to challenge in the collective bargaining process.

The Union, on the other hand, asserts that the Grievance was timely because it addressed the DOC's ongoing practice of leave denials. The Union disputes that the Arbitration Award imposes a new evidentiary standard, instead characterizing the Arbitration Award as a clarification of how the existing CBA language should be applied. Regarding the Side Letter, the Union argues that there exists no clear evidence that Monitors were intended to be excluded from the language of the Side Letter. Additionally, the Union argues that the Arbitrator correctly determined there was no binding past practice between the parties because the DOC's past leave denial process was arbitrary and not consistently applied.

### III. Discussion

The DOC argues the Arbitrator Award erred in its determination both on the timeliness and the merits of the Grievance. *See* DOC's Br. at 16-28. The DOC argues that the Grievance is untimely and that it is without foundation in, and does not logically flow from, the CBA. *See id.* The DOC is not entitled to relief.

8

Initially, we observe that appellate review of a grievance arbitration award is generally conducted pursuant to the two-part "essence test." *Sch. Dist. of Phila. v. Phila. Fed'n of Teachers*, 164 A.3d 546, 552 (Pa. Cmwlth. 2017). Under the essence test,

> [f]irst, the court shall determine if the issue as properly defined is within the terms of the collective bargaining agreement. Second, if the issue is embraced by the agreement, and thus, appropriately before the arbitrator, the arbitrator's award will be upheld if the arbitrator's interpretation can rationally be derived from the collective bargaining agreement. That is to say, a court will only vacate an arbitrator's award where the award indisputably and genuinely is without foundation in, or fails to logically flow from, the collective bargaining agreement.

*State Sys. of Higher Educ. (Cheyney Univ.) v. State Coll. Univ. Pro. Ass'n (PSEA-NEA)*, 743 A.2d 405, 413 (Pa. 1999); *see also Westmoreland Intermediate Unit # 7 v. Westmoreland Intermediate Unit # 7 Classroom Assistants Educ. Support Pers. Ass'n, PSEA/NEA*, 939 A.2d 855, 863 (Pa. 2007). Thus, "[a]n arbitrator's award must be sustained 'if it is based on anything that can be gleaned as the 'essence' of the [collective bargaining agreement].'" *Pa. State Sys. of Higher Educ. v. Ass'n of Pa. State Coll. & Univ. Facs.*, 98 A.3d 5, 14 (Pa. Cmwlth. 2014) (quoting *Am. Fed'n of State, Cnty. & Mun. Emps., Dist. Council 84, AFL–CIO v. City of Beaver Falls*, 459 A.2d 863, 865 (Pa. Cmwlth. 1983)). Further, "[t]he essence test does not permit this Court to vacate an arbitrator's award even if we disagree with the arbitrator's interpretation of the [collective bargaining agreement]." *Am. Fed'n of State, Cnty., & Mun. Emps., Dist. Council 87 v. Cnty. of Lackawanna*, 102 A.3d 1285, 1290 (Pa. Cmwlth. 2014) (citing *Cent. Susquehanna Intermediate Unit Educ. Ass'n v. Cent. Susquehanna Intermediate Unit # 16*, 459 A.2d 889, 890 (Pa. Cmwlth. 1983)). "The

9

essence test is an exceptionally deferential standard, because binding arbitration is a highly favored method of dispute resolution." *Dep't of Corr., State Corr. Inst. at Forest v. Pa. State Corr. Officers Ass'n*, 173 A.3d 854, 858 (Pa. Cmwlth. 2017) (citing *Northumberland Cnty. Comm'rs v. Am. Fed'n of State, Cnty. & Mun. Emps., AFL–CIO Local 2016, Council 86*, 71 A.3d 367, 374 (Pa. Cmwlth. 2013)). The party challenging an arbitration award bears the "burden of proving the award does not draw its essence from the [collective bargaining agreement]." *See Pa. State Sys. of Higher Educ.*, 98 A.3d at 14.

### A. Timeliness of Grievance

The DOC first argues that the Union failed to timely file the Grievance underlying this matter. *See* DOC Br. at 16-18. The DOC argues that the Trial Court erred by finding the Grievance timely because the CBA requires that a grievance be filed within 15 days of the date of the occurrence giving rise to the dispute and the Union did not comply with this time limitation. *See id.* We do not agree.

A grievance regarding conduct that occurred in the past may be timely filed outside of the timeliness specification for the filing of a grievance under a collective bargaining agreement where the grievable conduct is not discovered until a later time and the collective bargaining agreement makes provision for filing a grievance based on late discovery of grievable conduct. *See Slippery Rock Univ. of Pa., State Sys. of Higher Educ. v. Ass'n of Pa. State Coll. & Univ. Fac.*, 241 A.3d 1278, 1285 (Pa. Cmwlth. 2020) (holding that an arbitrator's determination that a grievance was timely filed drew its essence from the collective bargaining agreement where the collective bargaining agreement provided for the filing of grievances within 40 days of when a grievant learned of grievable conduct and the grievant did not learn of the conduct in question until 4 years after it occurred).

10

Here, Article 35, Section 2 of the CBA, on which the DOC relies, provides the following first step in the grievance process for individual employee grievances:

> The employee, either alone, or accompanied by the [Union] Representative, or the [Union] Representative, when entitled, shall present the grievance in writing to the respective institutional/boot camp representative or official Agency designee within 15 working days of the date of the occurrence giving rise to the dispute, or when the employee knew or by reasonable diligence should have known of the occurrence.

CBA, Article 35, Section 2, R.R. at 288a. Likewise, regarding the timing of statewide grievances, the CBA provides later in Article 35, Section 2 as follows:

> [The Union] shall present grievances concerning statewide actions directly to the Office of Administration, Bureau of Employment Relations for docketing to the Class Action Statewide Grievance Review Committee . . . within 15 work days of the date of the occurrence giving rise to the dispute, or the date when [the Union] knew *or by reasonable diligence should have known* of its occurrence.

*Id.* at 289a (emphasis added).

> Here, the Arbitrator found the Grievance timely, explaining:

> This Arbitrator finds the [G]rievance timely as it was filed in response to the continuing practice of denying leave, which had become more evident after repeated denials and after good faith efforts to resolve the issue at a statewide meeting were unsuccessful. As to the [Union's Western Joint Area Committee] minutes, it appears unrebutted that the issue raised in 2016 dealt with a request for compensatory leave, which is not the issue being

11

> addressed here. Moreover, it was another issue that . . . the Grievance Coordinator suspected may involve more than just one CCC and the request was therefore made to have it addressed at a statewide meeting. It was only after the receipt of additional information that the Union became sufficiently aware of the practice, and when efforts to resolve this dispute proved unsuccessful at the statewide meeting, the Union filed a timely grievance.

Arbitrator's Award at 21-22, R.R. at 1545a-46a.

We find no error in this determination. The harm to Monitors from the DOC's use of the one-slot-per-day leave approval practice was not obvious from the implementation of the policy. Only over time, through repeated denials of Monitor leave requests that would have been granted to other DOC employees, could the detrimental effects on Monitors have become evident enough to the Union to warrant the filing of a statewide grievance.[4] Once the Union received additional information about the objectionable leave approval practice and confirmed the DOC did not intend to alter the practice, it filed the Grievance pursuant to Article 35, Section 2 of the CBA, which permits the filing of a statewide grievance once the occurrence of grievable conduct becomes known through the exercise of reasonable diligence. The matter then proceeded through the grievance process and on to arbitration when the grievance process proved unsuccessful, as required by Article 35 of the CBA. The Arbitrator's explanation of the timeliness of the Grievance based on the filing of the Grievance after the receipt of additional information that illustrated the complained-of leave policy, therefore, arguably derives its essence from the language of CBA

---

[4] We observe that the DOC's insistence that the one-slot-per-day Monitor leave approval policy does not result in harm to or disparate treatment of Monitors proves that the harm suffered by Monitors under the policy is non-obvious.

12

Article 35, Section 2. *See Slippery Rock.* Accordingly, we find no error in the Arbitrator's determination that the Grievance was timely.

## B. Merits of The DOC's Arguments

The DOC also claims the Arbitrator erred in determining the merits of the matter. *See* DOC's Br. at 18-28. The DOC argues that the Arbitrator exceeded his authority by imposing a new standard for Monitor leaves request denials that does not appear in the CBA and by applying the Side Letter to Monitors. *See id.* at 18-23. The DOC further asserts that the Arbitrator erred by disregarding the parties' past practice regarding leave requests and that the DOC provides ample opportunities for Monitor leave consistent with the CBA. *See id.* at 23-28. We do not agree.

## 1. New Standard Not Appearing in the CBA

The DOC claims the Arbitrator exceeded his authority and imposed a new standard for leave denials by directing that operational efficiency should be considered in Monitor leave requests "only when specific and demonstrable needs require a denial of leave." DOC's Br. at 19. We do not agree.

In reviewing this argument, we stress "that the parties to a [collective bargaining agreement] have agreed to allow the arbitrator to give meaning to their agreement and fashion appropriate remedies[,]" and that "even though an arbitrator is not permitted to ignore the [collective bargaining agreement's] plain language in fashioning an award, the arbitrator's understanding of the plain language must prevail." *Millcreek Twp. Sch. Dist. v. Millcreek Twp. Educ. Support Pers. Ass'n*, 210 A.3d 993, 1006 (Pa. 2019).

Here, the CBA memorializes the parties' intent to engage, if necessary, in final and binding arbitration of grievances filed under the CBA. *See* CBA Art.

13

35, R.R. at 290a-91a. The CBA requires that arbitrators consider each case on its merits, using the CBA as the basis for a rendered decision, and directs that arbitrators "neither add to, subtract from, nor modify the provisions of th[e CBA]." *See id.*

In relevant part, Article 10, Section 2 of the CBA provides as follows:

Employees will be able to use earned combined leave for any reason. All leave will be requested in advance and approved (pre-scheduled) subject to management's responsibility to maintain efficient operations. Emergency requests (non pre-scheduled call offs) for leave will be approved in cases of employee illness, family illness, a stress day or other legitimate reasons. However, excessive requests for non pre-scheduled leave will be treated under the basic concepts of just cause discipline.

. . . .

Employees will select vacation by classification and shift (unless a local agreement provides otherwise) at each work location. The employee with the greatest Bargaining Unit Seniority shall be given a choice of leave periods in the event of any conflict in the selection. Where reasonable opportunities are available for selection of leaves on a seniority basis, approved request shall not be revoked if a conflict in selection develops after the selection period.

The selection period for vacations from January 1 to March 31 shall be November and December of the preceding year and the selection period for vacations from April through December shall be January 1 to March 31 unless there are existing or subsequent agreements on the selection period and procedure at appropriate local levels.

CBA, Art. 10, Sec. 2, R.R. at 227a.

14

In determining whether operational efficiency justified the DOC's restriction of Monitor leave opportunities to one slot per day, the Arbitrator found that the testimony on Nigrini and Hammers illustrated that this policy resulted in disproportionately high leave denials for Monitors compared to DOC employees at other similarly sized institutions. *See* Arbitration Award at 25, R.R. at 1549a. The Arbitrator also found that the testimony of Lieutenant Blankenhorn conceded that the policy has resulted in inappropriately denied Monitor leave requests. *See id.* On balance, the Arbitrator found that the DOC failed to "provide[] sufficient evidence to support the claim that the one-slot-per-day restriction is always necessary for maintaining safe and efficient operations" and, therefore, "that the [DOC's] practice of limiting leave to one slot per day for Monitors is inconsistent with Article 10, Section 2 of the [CBA.]" Arbitration Award at 25 & 26, R.R. at 1549a & 1550a. Accordingly, the Arbitrator determined that the DOC's "reliance on operational efficiency is not supported by sufficient evidence to justify a blanket restriction on [Monitor] leave." Arbitration Award at 26, R.R. at 1550a.

After making this determination regarding the DOC's one-slot-per-day Monitor leave policy, the Arbitrator directed that the DOC cease the policy and "[e]nsure that all prescheduled leave requests [be] considered based on bargain unit seniority, with operational efficiency considered only when specific and demonstrable needs require a denial of leave[.]" Arbitration Award at 26, R.R. at 1550a. The Arbitrator issued this directive in consideration of the concept – which he did not deny – "that operational needs must be considered in approving leave requests[.]" Arbitration Award at 25, R.R. at 1549a. The "specific and demonstrable needs" language of the Arbitration Award did not add, subtract, or modify the provisions of the CBA, but instead highlighted the Arbitrator's understanding of the

15

requirement that Monitor leave requests be considered on an individual basis for each request and not a broad, and possibly vague, "operational efficiency" basis, the application of which the Arbitrator noted had been incorrectly applied in the past. This statement, therefore, does not represent a new standard for leave denials, but instead explains the Arbitrator's understanding of the plain language of CBA Article 10, Section 2 when applied to the specific question of Monitor leave requests. Such interpretation is the function of arbitrators in general and was agreed upon by the parties under the instant CBA in particular. *See Millcreek*; CBA Art. 35. Additionally, we observe that the Arbitrator's determination can be gleaned from Article 10, Section 2 of the CBA, and therefore must be sustained.

### 2. Application of the Side Letter to Monitors

The DOC next argues that the Arbitrator erred and exceeded his authority by applying the Side Letter to Monitors. *See* DOC's Br. at 21-23. The DOC argues that the Side Letter specifically named Corrections Officers and Psychiatric Security Aides as the bargaining unit to whom the DOC agreed to ensure sufficient leave opportunities during the calendar year and that the Arbitrator's inclusion of Monitors as parties to the Side Letter was error. *See id.* We disagree.

The Side Letter was entered into in 1988 between the DOC and the Union's predecessor[5] and was incorporated into the CBA along with multiple other side agreements. *See* R.R. at 370a-414a. The Side Agreement provided, in relevant part:

> [The DOC is] willing to ensure sufficient opportunities
> exist for the Corrections Officers and Psychiatric Security

---

[5] American Federation of State, County, and Municipal Employees (AFSCME) Council 13.

Aides at each Institution to use the leave they will earn during the calendar year. Furthermore, the Departments are willing not to reduce the present number of opportunities which exist at the Institutions based on this review. However, further adjustments may be made based on management's responsibility to maintain efficient operations.

Side Letter, R.R. at 372a.

The DOC notes that Monitors were an extant DOC employee classification at the time the Side Letter was executed. *See* DOC's Br. at 22. Therefore, the DOC argues that the failure to specifically include Monitors (or their predecessors) in the Side Letter demonstrates the parties' intent to exclude them from the terms of the Side Letter and that, therefore, the Arbitrator's application of the Side Letter to Monitors represents an impermissible rewriting of the CBA. *See id.* at 22-23.

In applying the Side Letter to Monitors, the Arbitrator stated:

The 1988 [S]ide [L]etter addresses leave availability and usage for employees in the [DOC] and states the Commonwealth's commitment to providing 'sufficient opportunities' for employees to use the leave they earn during the calendar year. It guarantees that sufficient leave opportunities will be made available so that employees can utilize their earned leave within the same calendar year. Although [the DOC] asserts that [Monitors] were not part of the bargaining unit when the [S]ide [L]etter was negotiated, the Union has demonstrated that [Monitors] now operate under the same combined leave system as other DOC employees, such as Corrections Officers and Forensic Security Employees. Moreover, there is no compelling evidence to suggest that the [S]ide [L]etter was intended to omit such employees. Given that [Monitors] are part of the same leave system, the protections offered by the 1988 [S]ide [L]etter should

17

> logically extend to them, ensuring that they too have sufficient opportunities to use their earned leave.

Arbitration Award at 24, R.R. at 1548a.

We observe that the Side Letter was incorporated into the CBA, which applies to Corrections Officers, Forensic Security Employees, and Monitors alike. *See* CBA at 3, R.R. at 219a. Accordingly, the terms of the Side Letter apply to all these members of the Union's bargaining unit. *See City of Erie v. Fraternal Ord. of Police, Lodge 7*, 977 A.2d 3, 8-10 (Pa. Cmwlth. 2009) (noting that when a previous agreement is incorporated into a collective bargaining agreement, the document is treated as part of the agreement and is subject to the same legal standards and enforcement mechanisms as the collective bargaining agreement itself). Therefore, the Arbitrator's determination that the Side Letter applies to Monitors as well as Corrections Officers and Forensic Security Employees can be gleaned from the essence of the CBA. Accordingly, we must conclude that the Arbitrator did not abuse his discretion or exceed his authority in determining that the Side Letter applies to Monitors in addition to Corrections Officers and Forensic Security Employees. *See Pa. State Sys. of Higher Educ.*; *Am. Fed'n of State, Cnty., & Mun. Emps., Dist. Council 87*.

Further, we observe that, because the Arbitrator additionally determined that the DOC's one-slot-per-day Monitor leave approval policy did not comply with the language and requirements of Article 10, Section 2 of the CBA in any event, as discussed *supra*, any error that may have existed in the Arbitrator's application of the Side Letter to Monitors was harmless.

18

### 3. The Parties' Past Practice

The DOC also contends that the Arbitrator erred by disregarding the parties' past Monitor leave approval practice. *See* DOC's Br. at 23-25. This argument is unpersuasive.

In explaining what constitutes a "past practice," our Supreme Court has observed:

> A custom or practice is not something which arises simply because a given course of conduct has been pursued by Management or the employees on one or more occasions. A custom or a practice is a usage evolved by men as a normal reaction to a recurring type situation. It must be shown to be the accepted course of conduct characteristically repeated in response to the given set of underlying circumstances. This is not to say that the course of conduct must be accepted in the sense of both parties having agreed to it, but rather that it must be accepted in the sense of being regarded by the men involved as the normal and proper response to the underlying circumstances presented.

*Allegheny Cnty.*, 381 A.2d at 852 n.12 (quoting Sylvester Garrett, Chairman, Board of Arbitration, U. S. Steel Steelworkers, Grievance No. NL-453, Docket No. N-146, January 31, 1953); *see also Penns Manor Area Sch. Dist. v. Penns Manor Area Educ. Support Pers. Ass'n*, 953 A.2d 614, 618 (Pa. Cmwlth. 2008).

"Evidence of a past practice cannot be used if it conflicts with the current language of the CBA." *Pa. State Sys. of Higher Educ.*, 98 A.3d at 13 n.8 (citing *Dep't of Corr. v. Pa. State Corr. Officers Ass'n*, 38 A.3d 975 (Pa. Cmwlth. 2011)). However, this Court has explained:

19

Evidence of past practice can be used by an arbitrator to review the issue of the collective bargaining agreement in the following situations:

> (1) to clarify ambiguous language; (2) to implement contract language which sets forth only a general rule; (3) to modify or amend apparently unambiguous language which has arguably been waived by the parties; and (4) to create or prove a separate, enforceable condition of employment which cannot be derived from the express language of the [collective bargaining agreement].

*Pa. State Corr. Officers Ass'n v. Dep't of Corr., State Corr. Inst. at Benner*, 244 A.3d 85, 95 (Pa. Cmwlth. 2020) (quoting *Allegheny Cnty. v. Allegheny Cnty. Prison Emp. Indep. Union*, 381 A.2d 849, 852 (Pa. 1977)).

Here, the DOC contends that the Monitor leave policy at issue was followed for more than a decade without a challenge, thus suggesting that the DOC's application of the policy constituted an established past practice. However, when the mounting discrepancies and irregularities of the application of the DOC's Monitor leave approval policy became known to the Union, it filed the Grievance, alleging that the policy violated the CBA and the Side Agreement, and thus implicitly arguing that there was no established past practice supporting a contrary interpretation of either document.

The Arbitration Award did not expressly address past practice as such. By determining that the one-slot-per-day Monitor leave approval practice violated the CBA, however, the Arbitrator implicitly denied the existence of an established past practice supporting the DOC's interpretation of either the CBA or the Side Agreement. The Arbitrator's determination was within his discretion and authority as bargained for by the parties and will not be overturned on appeal.

20

### 4. Leave Opportunities for Monitors

Finally, the DOC argues that the Arbitrator erred in determining that the DOC's Monitor leave approval policy violated the CBA because the DOC provided ample evidence to demonstrate that it offers Monitors substantial and meaningful opportunities to utilize earned leave. *See* DOC's Br. at 25-28. Specifically, the DOC insists its evidence provided examples of flexibility in leave determinations that contradicted the Union's assertion that the DOC followed a blanket leave denial policy; that leave carryover data shows "that employees are able to take their leave in the ordinary course"; that the one-slot-per-day policy was merely a flexible guideline; and that other CCCs denied leave requests on bases similar to those used at Wernersville. *Id.* However, these are factual findings. Under our narrow review of arbitration awards, we are not permitted to reweigh the evidence in this matter. *See Rose Tree Media Sec'ies & Educ. Support Pers. Ass.n v. Rose Tree Media Sch. Dist.*, 136 A.3d 1069, 1078 (Pa. Cmwlth. 2016); *Shamokin Area Sch. Dist. v. AFSCME Dist. Council 86*, 20 A.3d 579, 581 (Pa. Cmwlth. 2011). Moreover, even if the DOC's argument could be viewed as asserting that the Arbitrator's Award did not draw its essence from the CBA, rather than that the Arbitrator erred in his factual findings – a highly doubtful reading of the DOC's argument – we have already determined that the Arbitration Award passes the Essence test. Accordingly, we reject the DOC's final argument.

### IV. Conclusion

For the reasons above, we affirm the Arbitrator's Award.

<br>

CHRISTINE FIZZANO CANNON, Judge

21

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Department of Corrections,        :
                    Petitioner    :
                                  :
        v.                    :
                                  :
Pennsylvania State Corrections    :
Officers Association,           :    No. 1611 C.D. 2024
                  Respondent   :

# **O R D E R**

AND NOW, this 27th day of January, 2026, the October 29, 2024 arbitrator's award is AFFIRMED.

_____
CHRISTINE FIZZANO CANNON, Judge